# CHICAGO & NORTH WESTERN RAILWAY CO. *v.* UNITED TRANSPORTATION UNION

No. 189.   Argued January 18, 1971—Decided June 1, 1971

HARLAN, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, MARSHALL, and BLACKMUN, JJ., joined.  BREN-

NAN, J., filed a dissenting opinion, in which BLACK, DOUGLAS, and WHITE, JJ., joined, *post*, p. 584.

*William H. Dempsey, Jr.*, argued the cause for petitioner. With him on the briefs were *David Booth Beers* and *Richard M. Freeman*.

*John H. Haley, Jr.*, argued the cause for respondent. With him on the brief was *John J. Naughton*.

*J. Albert Woll, Laurence Gold*, and *Thomas E. Harris* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging affirmance.

MR. JUSTICE HARLAN delivered the opinion of the Court.

The Chicago and North Western Railway Co., petitioner in this action, brought suit in the United States District Court for the Northern District of Illinois to enjoin a threatened strike by the respondent, the United Transportation Union. The substance of the complaint was that in the negotiations between the parties over work rules, the Union had failed to perform its obligation under § 2 First of the Railway Labor Act, as amended, 44 Stat. 577, 45 U. S. C. § 152 First, "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions." [1] Jurisdiction was said to rest on 28 U. S. C. §§ 1331 and

---

[1] The subsection provides:

"It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof."

1337. The Union in its answer contended that §§ 4, 7, and 8 of the Norris-LaGuardia Act, 47 Stat. 70, 71, 72, 29 U. S. C. §§ 104, 107, 108,[2] deprived the District Court of jurisdiction to issue a strike injunction and that in any event the complaint failed to state a claim upon which relief could be granted.[3] The District Judge, having heard evidence and argument, declined to pass on whether either party had violated § 2 First. In an unreported opinion, he concluded that the question was a matter for administrative determination by the National Mediation Board and was nonjusticiable; he further ruled that §§ 4 and 7 of the Norris-LaGuardia Act deprived the court of jurisdiction to issue an injunction against the Union's threatened strike. The Court of Appeals for the Seventh Circuit affirmed, 422 F. 2d 979, construing § 2 First as a statement of the purpose and policy of the subsequent provisions of the Act, and not as a specific requirement anticipating judicial enforcement. Rather, in that court's view, the enforcement of § 2 First was solely a matter for the National Mediation Board. *Id.*, at 985–988. We granted certiorari to consider this important question under the Railway Labor

---

[2] Section 4 reads in relevant part:

"No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:

"(a) Ceasing or refusing to perform any work or to remain in any relation of employment . . . ." 29 U. S. C. § 104.

Section 7 imposes strict procedural requirements on the issuance of injunctions in labor disputes. Section 8 is set out in n. 12, *infra.*

[3] The Union also averred that it had complied with the command of § 2 First and that the Railroad had been derelict in its duty under that section.

Act, on which the lower courts had expressed divergent views.[4]  For reasons that follow we reverse.

## I

For at least the past decade, the Nation's railroads and the respondent Union or its predecessors have been engaged in an off-and-on struggle over the number of brakemen to be employed on each train.  We find it unnecessary to describe this history in any great detail, either generally or with particular reference to petitioner. Accounts at earlier stages may be found in *Brotherhood of Locomotive Engineers* v. *Baltimore & Ohio R. Co.,* 372 U. S. 284, 285–288 (1963); *Brotherhood of Locomotive Firemen & Enginemen* v. *Chicago, Burlington & Quincy R. Co.,* 225 F. Supp. 11, 14–17 (DC), aff'd, 118 U. S. App. D. C. 100, 331 F. 2d 1020 (1964); *Brotherhood of Railroad Trainmen* v. *Akron & Barberton Belt R. Co.,* 128 U. S. App. D. C. 59, 66–70, 385 F. 2d 581, 588–592 (1967); *Brotherhood of Railroad Trainmen* v. *Atlantic Coast Line R. Co.,* 127 U. S. App. D. C. 298, 383 F. 2d 225 (1967); and see the opinion of the court below, 422 F. 2d, at 980–982, and n. 4.  For present purposes it is sufficient to observe that the parties have exhausted the formal procedures of the Railway Labor Act: notices, conferences, unsuccessful mediation, refusal by the Union to accept the National Mediation Board's proffer of arbitration, termination of mediation, and expiration of the 30-day cooling-off period of § 5 First, 45

---

[4] See, besides the opinion below, *Piedmont Aviation, Inc.* v. *Air Line Pilots Assn.,* 416 F. 2d 633 (CA4 1969); *Brotherhood of Railroad Trainmen* v. *Akron & Barberton Belt R. Co.,* 128 U. S. App. D. C. 59, 385 F. 2d 581 (1967), aff'g 253 F. Supp. 538 (1966); *Seaboard World Airlines, Inc.* v. *Transport Workers,* 425 F. 2d 1086 (CA2 1970); *United Industrial Workers* v. *Galveston Wharves,* 400 F. 2d 320 (CA5 1968).

U. S. C. § 155 First. The Railroad's charge that the Union had violated § 2 First was based principally on its contention that the Union had consistently refused to handle the dispute on a nationwide basis while maintaining an adamant determination that no agreement should be reached with the Chicago & North Western more favorable to the carrier than agreements which the Union had already reached with other railroads. The complaint also alleged that the Union had refused to bargain on the proposals in the Railroad's counternotices.

The narrow questions presented to us are whether § 2 First imposes a legal obligation on carriers and employees or is a mere exhortation; whether the obligation is enforceable by the judiciary; and whether the Norris-LaGuardia Act strips the federal courts of jurisdiction to enforce the obligation by a strike injunction. The parties have not requested us to decide whether the allegations of the complaint or the evidence presented at the hearing was sufficient to show a violation of § 2 First, and the lower courts, by their resolution of the threshold questions, did not reach the issue. Accordingly, we intimate no view on this matter.

## II

This Court has previously observed that "[t]he heart of the Railway Labor Act is the duty, imposed by § 2 First upon management and labor, 'to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes . . . in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.'" *Brotherhood of Railroad Trainmen* v. *Jacksonville Terminal Co.*, 394 U. S. 369, 377–378 (1969). It is not surprising that such is the case. As one leading commentator has said, in connection with the duty under

the National Labor Relations Act to bargain in good
faith, "[i]t was not enough for the law to compel the
parties to meet and treat without passing judgment upon
the quality of the negotiations. The bargaining status
of a union can be destroyed by going through the motions
of negotiating almost as easily as by bluntly withholding
recognition." Cox, The Duty to Bargain in Good Faith,
71 Harv. L. Rev. 1401, 1412–1413 (1958). We recognized
this to be true when we said in *NLRB* v. *Insurance
Agents' International,* 361 U. S. 477, 484–485 (1960), that
"the duty of management to bargain in good faith is es-
sentially a corollary of its duty to recognize the union."

*Virginian R. Co.* v. *System Federation No. 40,* 300
U. S. 515 (1937), furnishes an early illustration of this
principle in connection with the duty to "exert every
reasonable effort" under the Railway Labor Act. In that
case, the railroad refused to recognize a union certified
by the National Mediation Board as the duly authorized
representative of its shop workers, and instead sought
to coerce these employees to join a company union. The
employees sought and obtained an injunction requiring
the railroad to perform its duty under § 2 Ninth to
"treat with" their certified representative; the injunc-
tion also compelled the railroad "to exert every reason-
able effort" to make and maintain agreements with the
union. This Court affirmed that decree, explicitly re-
jecting the argument that the duty to exert every reason-
able effort was only a moral obligation. This conclusion
has been repeatedly referred to without criticism in
subsequent decisions.[5]

---

[5] *E. g., Elgin, J. & E. R. Co.* v. *Burley,* 325 U. S. 711, 721–722,
n. 12 (1945), adhered to on rehearing, 327 U. S. 661 (1946); *Stark*
v. *Wickard,* 321 U. S. 288, 306–307 (1944); *Order of Railroad
Telegraphers* v. *Chicago & N. W. R. Co.,* 362 U. S. 330, 339 (1960);
*International Association of Machinists* v. *Street,* 367 U. S. 740, 758

576

The conclusion that § 2 First is more than merely hortatory finds support in the legislative history of the Railway Labor Act as well. As this Court has often noted, the Railway Labor Act of 1926 was, and was acknowledged to be, an agreement worked out between management and labor, and ratified by the Congress and the President.[6] Accordingly, the statements of the spokesmen for the two parties made in the hearings on the proposed Act are entitled to great weight in the construction of the Act.[7]

In the House hearings, Donald R. Richberg, counsel for the organized railway employees supporting the bill, was unequivocal on whether § 2 First imposed a legal obligation on the parties. He stated, "it is [the parties'] duty to exert every reasonable effort . . . to settle all disputes, whether arising out of the abrogation of agreements or otherwise, in order to avoid any interruption to commerce. In other words, the legal obligation is imposed, and as I have previously stated, and I want to emphasize it, I believe that the deliberate violation of that legal obligation could be prevented by court compulsion." [8] Mr. Richberg went on to describe why the bill had been drafted in general language applicable equally to both parties, rather than in terms of specific

(1961); *Brotherhood of Railway Clerks* v. *Association for the Benefit of Non-Contract Employees,* 380 U. S. 650, 658 (1965); *Detroit & T. S. L. R. Co.* v. *United Transportation Union,* 396 U. S. 142, 149, 151 (1969).

[6] *E. g., International Association of Machinists* v. *Street,* 367 U. S. 740, 758 (1961).

[7] See, *e. g., Detroit & T. S. L. R. Co.* v. *United Transportation Union,* 396 U. S. 142, 151 n. 18, 152 n. 19, 153 n. 20 (1969).

[8] Hearings on Railroad Labor Disputes (H. R. 7180) before the House Committee on Interstate and Foreign Commerce, 69th Cong., 1st Sess., 91 (1926). See also *id.,* at 40–41, 66, 84–85.

requirements or prohibitions accompanied by explicit sanctions:

> "We believe, and this law has been written upon the theory, that in the development of the obligations in industrial relations and the law in regard thereto, there is more danger in attempting to write specific provisions and penalties into the law than there is in writing the general duties and obligations into the law and letting the enforcement of those duties and obligations develop through the courts in the way in which the common law has developed in England and America." [9]

Accordingly, we think it plain that § 2 First was intended to be more than a mere statement of policy or exhortation to the parties; rather, it was designed to be a legal obligation, enforceable by whatever appropriate means might be developed on a case-by-case basis.

The Court of Appeals, in seemingly coming to the contrary conclusion, relied on this Court's decision in *General Committee of Adjustment* v. *Missouri-Kansas-Texas R. Co.*, 320 U. S. 323 (1943). In that case, the Court held that jurisdictional disputes between unions were not justiciable, but were left by the Act either to resolution by the National Mediation Board under § 2 Ninth or to the economic muscle of the parties. Reliance had been placed on § 2 Second, which requires that all disputes should be considered and if possible decided in conference of the authorized representatives of the parties. The Court held that this reliance was misplaced: "Nor does § 2, Second make justiciable what otherwise is not. . . . § 2, Second, like § 2, First, merely states the policy which those other provisions buttress with more particularized commands." *Id.*, at 334 (footnote omitted).

[9] *Id.*, at 91. See also *id.*, at 66.

In light of the place of § 2 First in the scheme of the Railway Labor Act, the legislative history of that section, and the decisions interpreting it, the passing reference to it in the *M–K–T* case cannot bear the weight which the Court of Appeals sought to place upon it.

## III

Given that § 2 First imposes a legal obligation on the parties, the question remains whether it is an obligation enforceable by the judiciary. We have often been confronted with similar questions in connection with other duties under the Railway Labor Act.[10] Our cases reveal that where the statutory language and legislative history are unclear, the propriety of judicial enforcement turns on the importance of the duty in the scheme of the Act, the capacity of the courts to enforce it effectively, and the necessity for judicial enforcement if the right of the aggrieved party is not to prove illusory.

We have already observed that the obligation under § 2 First is central to the effective working of the Railway Labor Act. The strictest compliance with the formal procedures of the Act is meaningless if one party goes through the motions with "a desire not to reach an agreement." *NLRB* v. *Reed & Prince Mfg. Co.*, 205 F. 2d 131, 134 (CA1 1953). While cases in which the union is the party with this attitude are perhaps rare, they are not unknown. See *Chicago Typographical Union No. 16*, 86 N. L. R. B. 1041 (1949), enforced *sub nom. American Newspaper Publishers Assn.* v. *NLRB*, 193 F. 2d 782 (CA7 1951), aff'd as to another issue, 345 U. S. 100

---

[10] See, *e. g., Texas & N. O. R. Co.* v. *Brotherhood of Railway Clerks*, 281 U. S. 548 (1930); *Virginian R. Co.* v. *System Federation No. 40*, 300 U. S. 515 (1937); *Brotherhood of Railroad Trainmen* v. *Howard*, 343 U. S. 768 (1952).

(1953). We think that at least to this extent the duty to exert every reasonable effort is of the essence.[11]

The capacity of the courts to enforce this duty was considered and affirmed in the *Virginian* case. Mr. Justice Stone, speaking for the Court, noted that "whether action taken or omitted is in good faith or reasonable, are everyday subjects of inquiry by courts in framing and enforcing their decrees." 300 U. S., at 550. Section 8 of the Norris-LaGuardia Act explicitly requires district courts to determine whether plaintiffs have "failed to make every reasonable effort" to settle the dispute out of which the request for the injunction grows.[12] We have no reason to believe that the district courts are less capable of making the inquiry in the one situation than in the other.

Finally, we must consider the Court of Appeals' posi-

---

[11] While we have no occasion to determine whether § 2 First requires more of the parties than avoidance of "bad faith" as defined by Judge Magruder in *Reed & Prince, supra,* we note two caveats. First, parallels between the duty to bargain in good faith and the duty to exert every reasonable effort, like all parallels between the NLRA and the Railway Labor Act, should be drawn with the utmost care and with full awareness of the differences between the statutory schemes. Cf. *Brotherhood of Railroad Trainmen* v. *Jacksonville Terminal Co.,* 394 U. S. 369, 383 (1969). Second, great circumspection should be used in going beyond cases involving "desire not to reach an agreement," for doing so risks infringement of the strong federal labor policy against governmental interference with the substantive terms of collective-bargaining agreements. See n. 19, *infra.*

[12] The section provides in full:

"No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration." 29 U. S. C. § 108.

tion that the question whether a party had exerted every reasonable effort was committed by the Railway Labor Act to the National Mediation Board rather than to the courts. We believe that the legislative history of the Railway Labor Act rather plainly disproves this contention. It is commonplace that the 1926 Railway Labor Act was enacted because of dissatisfaction with the 1920 Transportation Act, and particularly with the performance of the Railroad Labor Board. While there were many causes of this dissatisfaction, one of the most prominent was that because of its adjudicatory functions, the Board effectively lost any influence in attempting to settle disputes. Throughout the hearings on the bill which became the 1926 Act there are repeated expressions of concern that the National Mediation Board should retain no adjudicatory function, so that it might maintain the confidence of both parties.[13] And as the Court noted in *Switchmen's Union* v. *National Mediation Board,* 320 U. S. 297, 303 (1943), when Congress in 1934 gave the Board power to resolve certain jurisdictional disputes, it authorized the Board to appoint a committee of neutrals to decide the dispute "so that the Board's

---

[13] *E. g., Hearings, supra,* n. 8, at 18 (Mr. Richberg):

"The board of mediation, to preserve its ability to mediate year after year between the parties, must not be given any duties to make public reports condemning one party or the other, even though the board may think one party is wrong. That is the fundamental cause of failure of the [Railroad] Labor Board. That is the reason why the Labor Board machinery never would work, because a board was constituted to sit and deliver opinions which must be opinions for or against one party, and as soon as that board began delivering opinions publicly against a party, that party was sure the board was unfair to it. That is human nature. The board, in other words, was created in a manner to destroy any confidence in itself.

"The board of mediators is not for that function. The board of mediators should never make any reports to the public condemning one party or the other. Their duty is that of remaining persuaders."

'own usefulness of settling disputes that might arise thereafter might not be impaired.' S. Rep. No. 1065, 73d Cong., 2d Sess., p. 3." Only last Term we referred to the fact that "the Mediation Board has no adjudicatory authority with regard to major disputes." *Detroit & T. S. L. R. Co.* v. *United Transportation Union,* 396 U. S. 142, 158 (1969). In light of these considerations, we think the conclusion inescapable that Congress intended the enforcement of § 2 First to be overseen by appropriate judicial means rather than by the Mediation Board's retaining jurisdiction over the dispute or prematurely releasing the parties for resort to self-help if it feels such action called for.[14]

## IV

We turn finally to the question whether § 4 of the Norris-LaGuardia Act [15] prohibits the use of a strike injunction in all cases of violation of § 2 First. The fundamental principles in this area were epitomized in *International Association of Machinists* v. *Street,* 367 U. S. 740, 772–773 (1961):

> "The Norris-LaGuardia Act, 47 Stat. 70, 29 U. S. C. §§ 101–115, expresses a basic policy against the injunction of activities of labor unions. We have held that the Act does not deprive the federal courts of jurisdiction to enjoin compliance with various mandates of the Railway Labor Act. *Virginian R. Co.* v. *System Federation,* 300 U. S. 515; *Graham* v. *Brotherhood of Locomotive Firemen & Enginemen,*

---

[14] If such were the exclusive remedy for violations of § 2 First, not only would it endanger the effectiveness of the Board's mediatory role and risk premature interruptions of transportation, but it would provide no remedy for cases where the violations of § 2 First occurred or first became apparent after the Board had certified that its mediatory efforts had failed.

[15] See n. 2, *supra,* for the text.

338 U. S. 232. However, the policy of the Act suggests that the courts should hesitate to fix upon the injunctive remedy for breaches of duty owing under the labor laws unless that remedy alone can effectively guard the plaintiff's right."

Similar statements may be found in many of our opinions.[16] We consider that these statements properly accommodate the conflicting policies of our labor laws, and we adhere to them. We find it quite impossible to say that no set of circumstances could arise where a strike injunction is the only practical, effective means of enforcing the command of § 2 First. Accordingly, our prior decisions lead us to hold that the Norris-LaGuardia Act did not forbid the District Court from even considering whether this is such a case.[17] If we have misinterpreted the congressional purpose, Congress can remedy the situation by speaking more clearly. In the meantime we have no choice but to trace out as best we may the uncertain line of appropriate accommodation of two statutes with purposes that lead in opposing directions.[18]

---

[16] See *Virginian R. Co.* v. *System Federation No. 40,* 300 U. S., at 562–563; *Graham* v. *Brotherhood of Locomotive Firemen & Enginemen,* 338 U. S. 232, 237 (1949); *Brotherhood of Railroad Trainmen* v. *Howard,* 343 U. S. 768, 774 (1952); *Brotherhood of Railroad Trainmen* v. *Chicago R. & I. R. Co.,* 353 U. S. 30, 41–42 (1957); cf. *Order of Railroad Telegraphers* v. *Chicago & N. W. R. Co.,* 362 U. S., at 338–339; *id.,* at 360–364 (dissenting opinion); *Textile Workers Union* v. *Lincoln Mills,* 353 U. S. 448, 458 (1957).

[17] The congressional debates over the Norris-LaGuardia Act support a construction of that Act permitting federal courts to enjoin strikes in violation of the Railway Labor Act in appropriate cases. See 75 Cong. Rec. 4937–4938 (Sen. Blaine); *id.,* at 5499, 5504 (Rep. LaGuardia).

[18] Section 2 First was re-enacted in 1934, two years after the Norris-LaGuardia Act. Act of June 21, 1934, c. 691, 48 Stat. 1185. In the event of irreconcilable conflict between the policies of the earlier, general provisions of the Norris-LaGuardia Act and those of

We recognize, of course, that our holding that strike injunctions may issue when such a remedy is the only practical, effective means of enforcing the duty to exert every reasonable effort to make and maintain agreements falls far short of that definiteness and clarity which businessmen and labor leaders undoubtedly desire. It creates a not insignificant danger that parties will structure their negotiating positions and tactics with an eye on the courts, rather than restricting their attention to the business at hand. Moreover, the party seeking to maintain the status quo may be less willing to compromise during the determinate processes of the Railway Labor Act if he believes that there is a chance of indefinitely postponing the other party's resort to self-help after those procedures have been exhausted. See *Brotherhood of Railroad Trainmen* v. *Jacksonville Terminal Co.*, 394 U. S., at 380–381; cf. Hearings, *supra*, n. 8, at 17, 50, 100 (Mr. Richberg); *id.*, at 190 (Mr. Robertson). Finally, the vagueness of the obligation under § 2 First could provide a cover for freewheeling judicial interference in labor relations of the sort that called forth the Norris-LaGuardia Act in the first place.[19]

These weighty considerations indeed counsel restraint in the issuance of strike injunctions based on violations of § 2 First. See n. 11, *supra*. Nevertheless, the result reached today is unavoidable if we are to give effect to all our labor laws—enacted as they were by Congresses

the subsequent, more specific provisions of § 2 First, the latter would prevail under familiar principles of statutory construction. *Virginian R. Co.* v. *System Federation No. 40*, 300 U. S., at 563.

[19] Section 8 (d) of the National Labor Relations Act, 29 U. S. C. § 158 (d), was added precisely because of congressional concern that the NLRB had intruded too deeply into the collective-bargaining process under the guise of enforcing the duty to bargain in good faith. See *NLRB* v. *American National Insurance Co.*, 343 U. S. 395 (1952); *NLRB* v. *Insurance Agents' International*, 361 U. S. 477 (1960).

of differing political makeup and differing views on labor relations—rather than restrict our examination to those pieces of legislation which are in accord with our personal views of sound labor policy. See *Boys Markets* v. *Retail Clerks Local 770*, 398 U. S. 235, 250 (1970).

## V

As we noted at the outset, we have not been requested to rule on whether the record shows a violation of § 2 First in circumstances justifying a strike injunction, and we do not do so. Such a question should be examined by this Court, if at all, only after the facts have been marshaled and the issues clarified through the decisions of lower courts.

In view of the uncertainty heretofore existing on what constituted a violation of § 2 First and what showing was necessary to make out a case for a strike injunction, we believe the appropriate course is to remand the case to the Court of Appeals with instructions to return the case to the District Court for the taking of such further evidence as the parties may deem necessary and that court may find helpful in passing on the issues which the case presents in light of our opinion today.

*Reversed and remanded.*

MR. JUSTICE BRENNAN, with whom MR. JUSTICE BLACK, MR. JUSTICE DOUGLAS, and MR. JUSTICE WHITE join, dissenting.

The instant dispute between the Chicago & North Western Railway Company (Railway) and the United Transportation Union (Union) reaches back to the decision of Arbitration Board No. 282, established pursuant to 77 Stat. 132 (1963). That board was established by Congress, after the failure of the dispute-settlement

machinery of the Railway Labor Act, to arbitrate disputes between various carriers and unions over the number of brakemen required on trains and the necessity of firemen on diesel locomotives. Insofar as is here pertinent, Board 282's award ultimately led to elimination of approximately 8,000 brakemen's jobs across the Nation. By its terms, however, the award expired January 25, 1966. Prior to expiration, the Union served upon the Railway notices under § 6 of the Railway Labor Act, 45 U. S. C. § 156,[1] which called for re-establishing many of the brakemen's positions eliminated by Board 282 by changing the existing agreements to require not less than two brakemen on every freight and yard crew. The Railway reciprocated by serving upon the Union a § 6 notice requesting an agreement that would make crew size a matter of managerial judgment. The parties held conferences under § 6 without reaching agreement. The National Mediation Board attempted to mediate the dispute pursuant to § 5, 45 U. S. C. § 155,[2] failed, and prof-

---

[1] Section 6 provides in part:

"Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions . . . ."

[2] Section 5 First, provides in part:

"The parties, or either party, to a dispute between an employee or group of employees and a carrier may invoke the services of the Mediation Board in any of the following cases:

"(a) A dispute concerning changes in rates of pay, rules, or working conditions not adjusted by the parties in conference.

.       .       .       .       .

"The Mediation Board may proffer its services in case any labor emergency is found by it to exist at any time.

"In either event the said Board shall promptly put itself in communication with the parties to such controversy, and shall use its best efforts, by mediation, to bring them to agreement. If such efforts . . . shall be unsuccessful, the said Board shall at once endeavor as its final required action . . . to induce the parties to

fered arbitration pursuant to the same section. After the Union declined to accept arbitration, the National Mediation Board terminated its jurisdiction. Since no emergency board was appointed by the President under § 10, 45 U. S. C. § 160,[3] after the 30-day cooling-off period of § 5 had run,[4] the Act's prohibition against resort to self-help measures lapsed.

Thereafter, the Railway brought this action in Federal District Court seeking an injunction against a threatened strike, alleging that the Union had not lived up to its obligation under § 2 First, 45 U. S. C. § 152 First, to "exert every reasonable effort" to make and maintain working agreements. Specifically, the Railway alleged

submit their controversy to arbitration, in accordance with the provisions of this chapter."

[3] Section 10 provides in part:

"If a dispute between a carrier and its employees be not adjusted under the foregoing provisions of this chapter and should, in the judgment of the Mediation Board, threaten substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President, who may thereupon, in his discretion, create a board to investigate and report respecting such dispute. . . .

.     .     .     .     .

"After the creation of such board and for thirty days after such board has made its report to the President, no change, except by agreement, shall be made by the parties to the controversy in the conditions out of which the dispute arose."

[4] Section 5 First, provides in part:

"If arbitration at the request of the Board shall be refused by one or both parties, the Board shall at once notify both parties in writing that its mediatory efforts have failed and for thirty days thereafter, unless in the intervening period the parties agree to arbitration, or an emergency board shall be created under section 160 of this title, no change shall be made in the rates of pay, rules, or working conditions or established practices in effect prior to the time the dispute arose."

that the Union had violated its statutory duty in the following ways:

"First: Having insisted in the foregoing dispute upon bargaining separately with the plaintiff carrier instead of bargaining jointly with all the railroads upon which the BRT [Brotherhood of Railroad Trainmen] had served like notices, nevertheless

"(a) The defendant has refused to bargain on the proposals in the carrier's counter-notices to reduce the size of main line road crews;

"(b) The defendant has insisted that any agreement on the C&NW be no more favorable to the C&NW than agreements reached on the other railroads upon which the BRT served like notices;

"(c) The defendant has entered negotiations with a fixed position and a determination not to deviate from the position regardless of what relevant consideration might be advanced by the C&NW; and

Second: Notwithstanding the foregoing, the defendant has refused to engage in national handling of this dispute and to negotiate on a joint basis a national crew consist agreement with all the railroads on which the BRT served like notices." App. 7.

The District Judge denied the injunction, holding that "[w]hether there has been compliance with Section 2 First . . . is a matter for administrative determination . . . is not justiciable and this Court does not have jurisdiction to consider or adjudicate disputes with respect to compliance with such subsection . . . ." App. 204–205. The Court of Appeals affirmed, 422 F. 2d 979 (CA7 1970). We granted certiorari, 400 U. S. 818 (1970), to resolve a conflict in the circuits. *Piedmont Aviation, Inc.* v. *Air Line Pilots Assn.,* 416 F. 2d 633 (CA4 1969). I

believe that the Railway Labor Act evidences a clear intention to prohibit courts from weighing the relative merits of each party's attempts to reach a bargaining agreement, and that the decision of the Seventh Circuit should, therefore, be affirmed.

This case presents the question whether, in a major dispute, a District Court may enjoin self-help measures after the completion of the statutory procedures if it determines that a party has not made "every reasonable effort" to reach agreement as required by § 2 First. Underlying this question is the corollary one, to what extent a District Court may inquire into collective negotiations in determining whether a party has complied with its statutory duty.

In answering these questions particular attention must be paid to the legislative history of the Act. Railway labor dispute-settlement law has undergone a long legislative evolution which this Court has previously explored. *International Association of Machinists* v. *Street,* 367 U. S. 740, 750–760, and nn. 10–12 (1961); see also *Texas & N. O. R. Co.* v. *Brotherhood of Railway Clerks,* 281 U. S. 548 (1930); *Virginian R. Co.* v. *System Federation No. 40,* 300 U. S. 515 (1937); *Union Pacific R. Co.* v. *Price,* 360 U. S. 601 (1959); *Detroit & T. S. L. R. Co.* v. *United Transportation Union,* 396 U. S. 142 (1969). Much of the experimentation prior to passage of the Railway Labor Act of 1926 proved unsuccessful. Recognition that growing unrest in the railway industry had created a situation with potentially grave public consequences, led the President, in three messages to Congress between 1923 and 1925, and both the Republican and Democratic Parties, in 1924, to call for unprecedented cooperation between carriers and unions. H. R. Rep. No. 328, 69th Cong., 1st Sess., 2–3 (1926); S. Rep. No. 606, 69th Cong., 1st Sess., 2–3 (1926); Hearings on

Railroad Labor Disputes (H. R. 7180) before the House Committee on Interstate and Foreign Commerce, 69th Cong., 1st Sess., 21–22, 90, 98, 197 (1926) (hereinafter Hearings). These basically antagonistic forces were urged to sit down and develop a workable solution for settling disputes in their industry in order to minimize the rupture of the public services that they provided. The legislative product devised by the parties themselves, which Congress enacted in 1926 as the Railway Labor Act, 44 Stat. 577, was a unique blend of moral and legal duties looking toward settlement through conciliation, mediation, voluntary arbitration, presidential intervention, and finally, in case of ultimate failure of the statutory machinery, resort to traditional self-help measures. The cooperation involved was unparalleled in this country's labor history. It was felt significant to all involved that the parties themselves had worked out a solution and had presented it to Congress.[5]

---

[5] "Mr. Richberg: . . . This bill which has been introduced in the House and in the Senate simultaneously represents the product of months of negotiations and conferences between the representatives of 20 railroad labor organizations and the Association of Railway Executives representatives, representing the great majority, practically all, of the carriers by railroad." Hearings 9.

"I want to emphasize again that this bill is the product of a negotiation between employers and employees which is unparalleled, I believe, in the history of American industrial relations.

"For the first time representatives of a great majority of all the employers and all the employees of one industry conferred for several months for the purpose of creating by agreement a machinery for the peaceful and prompt adjustment of both major and minor disagreements that might impair the efficiency of operations or interrupt the service they render to the community. They are now asking to have this agreement written into law, not for the purpose of having governmental power exerted to compel the parties to do right but in order to obtain Government aid in their cooperative efforts and in order to assure the public that their

The significance lay in the fact that since the bill represented "the agreement of the parties . . . they will be under the moral obligation to see that their agreement accomplishes its purpose, and that if enacted into law they will desire to prove the law a success." Hearings 21.

The outstanding feature of the bill was that it was voluntary—Congress, the carriers, and the unions all recognized that there were very few enforceable provisions, and still fewer judicially enforceable ones.[6] In testimony before Congress, Mr. Richberg, the major spokesman for the unions, stated, "[O]ur thought has been in this law not to write a lot of statute law for the courts to enforce. . . . We expect that most of the provisions of this bill are to be enforced by the power of persuasion, either exercised by the parties themselves or by the Gov-

---

interest in efficient continuous transportation service will be permanently protected.

. . . . .

"It is a remarkable fact that all parties concerned were able to lay aside the hostile feelings and suspicions that had too often characterized past negotiations and to act upon the belief that if an agreement were reached, it would be carried out in the same spirit of good faith and fair dealing that characterized the negotiations." Hearings 21–22.

[6] Mr. Thom (carrier representative). "I wish you to bear that fact in mind—the moral obligation now resting upon each one of the proponents of this bill in respect to its effect upon the public interest. Suppose it is changed in any important particular, what effect will that have upon the moral obligation to which I have just alluded? . . .

"I personally attach most substantial importance to the view I am now asking you to consider. I think that when a measure is adopted, backed by the moral obligation of the parties that it will not be permitted in any degree to [a]ffect adversely the public interests, it would be a most unwise thing to insert measures of coercion, substitute principles, or anything that would have the effect of liberating these parties from the position they have voluntarily assumed before you, that this is a workable measure." Hearings 115.

ernment board of mediation representing the public interest." Hearings 65–66. Congress recognized the absence of coercive measures but chose not to add them, noting that "it is in the public interest to permit a fair trial of the method of amicable adjustment agreed upon by the parties . . . ." S. Rep. No. 606, 69th Cong., 1st Sess., 4 (1926). Thus, the history of the Act reveals that in dealing with major disputes Congress was content to enact a machinery which dragged on, with cooling-off periods and various status quo restrictions, while the parties were required to "treat with" one another, § 2 Ninth, 45 U. S. C. § 152 Ninth, in the hope that ultimately they would voluntarily reach agreement.

In order to bring about settlement, it was made "the duty of all carriers . . . and employees to exert every reasonable effort to make and maintain agreements . . . in order to avoid any interruption to commerce . . . ." § 2 First, 45 U. S. C. § 152 First. From the outset, Congress was interested in the meaning of this provision and whether this statutory duty was viewed by the drafters to be a judicially enforceable one. During the hearings on the House bill the following colloquy occurred:

> "Mr. Huddleston. Now, referring to section 2 on page 3, [']it shall be the duty of all carriers, their officers, agents, and employees, to exert every reasonable effort to make and maintain agreements,' etc. Do you agree that that also is unenforceable by judicial proceeding?
>
> "Mr. Richberg. Not always. I think any action involving an arbitrary refusal to comply with that duty might be subject to judicial compulsion. I am sure it would work both ways.
>
> .        .        .        .        .
>
> "In other words, I think it would not be exerting a reasonable effort to make and maintain agreements,

for a carrier or its appropriate officers to refuse to even meet a committee that sought to make an agreement.

.        .        .        .        .

"Mr. Huddleston.   You think, then, that this section is enforceable?

"Mr. Richberg.   I think that a duty imposed by law is enforceable by judicial power, yes.   Of course, this is not a duty which could be enforced in a very absolute way, because it is a duty to exert every reasonable effort.   In other words, all that could be enforced by the court would be an order against an arbitrary refusal to even attempt to comply with that duty, but I believe that could be subject to judicial power."   Hearings 84–85.

In response to an earlier question Mr. Richberg had testified:

". . . In the first place, I think if either party showed a willful disregard of the fundamental requirements, that they should make every reasonable effort to make an agreement—in other words, if they refuse absolutely to confer, to meet or discuss or negotiate, I think there is a question as to whether there might not be invoked some judicial compulsion, but I would rather see that left to development rather than see it written into the law. But outside of that, if the parties do not make an agreement, I think you face this question, first, as to whether the Government board of mediation could bring them to see the error of their ways; and, second, if that effort was unsuccessful, whether they could bring them to refer that dispute to an arbitration, and then if it was of sufficient magnitude so that it actually affected commerce substantially, whether the emergency board could not itself bring about an adjustment."   Hearings 66.

Since the Act was the product of months of discussion between the carriers and unions and since Mr. Richberg's testimony was uncontradicted by the representatives of the carriers,[7] it seems fair to say that the above testimony evidences an understanding on the part of the unions, carriers, and Congress that the duty "to exert every reasonable effort" was judicially enforceable at least to the extent of requiring the parties to sit down at the bargaining table and talk to each other. This is exactly what this Court held in *Virginian R. Co.* v. *System Federation No. 40,* 300 U. S. 515 (1937). That case was an equitable action brought by the Federation to force the Railway to bargain with it. The carrier, despite the Mediation Board's certification of the Federation as the bargaining agent of the employees, had continued to deal only with its company union. This Court held that the duty to exert every reasonable effort to reach agreement, which had been held to be without legal sanction in the context of the previous Act, *Pennsylvania R. Co.* v. *Labor Board,* 261 U. S. 72 (1923),

> "no longer stand[s] alone and unaided by mandatory provision . . . . The amendment of the Railway Labor Act added new provisions in § 2, Ninth, which makes it the duty of the Mediation Board, when any dispute arises among the carrier's employees, 'as to who are the representatives of such employees,' to investigate the dispute and to certify . . . the name of the organization authorized to represent the employees. It commands that 'Upon receipt of such certification the carrier shall treat with the representative so certified as the representative of the craft or class for the purposes of this Act.'

---

[7] Carrier representatives were present throughout the congressional testimony of Mr. Richberg. None contradicted Mr. Richberg's viewpoint in their testimony.

"It is, we think, not open to doubt that Congress intended that this requirement be mandatory upon the railroad employer, and that its command, in a proper case, be enforced by the courts." 300 U. S., at 544–545.

"[W]e cannot assume that its [§ 2 Ninth's] addition to the statute was purposeless . . . . The statute does not undertake to compel agreement between the employer and employees, but it does command those preliminary steps without which no agreement can be reached. It at least requires the employer to meet and confer with the authorized representative of its employees, to listen to their complaints, to make reasonable effort to compose differences—in short, to enter into a negotiation for the settlement of labor disputes such as is contemplated by § 2, First." *Id.,* at 547–548.

*Virginian R. Co.* stands, then, for the proposition that, once the Board has certified a union as the bargaining agent of the employees, a court may require the employer to "treat with" that representative in order that the statutory machinery of the Railway Labor Act be given a chance to bring about a voluntary settlement. It is, in essence, an order for the parties to recognize one another and *begin* the long, drawn-out statutory bargaining process.

In the years since *Virginian R. Co.* this Court, in the context of a major dispute, has authorized the issuance of an injunction in only two other carefully limited classes of railway litigation—that seeking to prevent invidious discrimination on the part of a union as against employees and that seeking to prevent violation of the Act's status quo provisions during bargaining. In a series of cases beginning with *Steele* v. *Louisville & N. R. Co.,*

323 U. S. 192 (1944),[8] this Court has held that "the language of the Act to which we have referred [§§ 1 Sixth; 2 Second, Third, Fourth, and Ninth], read in the light of the purposes of the Act, expresses the aim of Congress to impose on the bargaining representative of a craft or class of employees the duty to exercise fairly the power conferred upon it in behalf of all those for whom it acts, without hostile discrimination against them." *Id.*, at 202–203. Recently, in *Detroit & T. S. L. R. Co.* v. *United Transportation Union*, 396 U. S. 142 (1969), this Court held that the Act's status quo requirement, which "is central to its design," could be enforced by judicial authority. *Id.*, at 150. While in each of these instances the Court found specific, positive statutory mandates for judicial interference, the underlying cohesiveness of the decisions lies in the fact that in each instance the scheme of the Railway Labor Act could not begin to work without judicial involvement. That is, unless the unions fairly represented all of their employees; unless the employer bargained with the certified representative of the employees; unless the status quo was maintained during the entire range of bargaining, the statutory mechanism could not hope to induce a negotiated settlement. In each case the judicial involvement was minimal and in keeping with the central theme of the Act—to bring about voluntary settlement. In each case the "collective bargaining agents stepped outside their legal duties and violated the Act which called them into being . . . ." *Order of Railroad Telegraphers* v. *Chicago & N. W. R. Co.*, 362 U. S. 330, 338 (1960).

---

[8] See also *Tunstall* v. *Brotherhood of Locomotive Firemen & Enginemen*, 323 U. S. 210 (1944); *Graham* v. *Brotherhood of Locomotive Firemen & Enginemen*, 338 U. S. 232 (1949); *Brotherhood of Railroad Trainmen* v. *Howard*, 343 U. S. 768 (1952).

In the instant case, we have an entirely different situation. Here, all parties were fairly represented, the status quo was being maintained, and, most important, each bargaining representative met and conferred with his counterpart. The step-by-step procedures prescribed by the Railway Labor Act had been carried through. In essence, the Court holds that a district court has the duty under § 2 First, to assess the bargaining tactics of each of the parties *after* the entire statutory scheme has run its course. If, then, the court determines that a party had not exerted sufficient effort to reach settlement, it should enjoin self-help measures, and, if such action is to make any sense within this statutory scheme, remand the parties to some unspecified point in the bargaining process. Such a notion is entirely contrary to the carefully constructed premise of the Railway Labor Act.

My summary of the legislative history of the Act clearly discloses that judicial involvement in the railway bargaining process was to be minuscule since the entire focus of the Act was toward achieving a voluntary settlement between the protagonists. "The Railway Labor Act, like the National Labor Relations Act, does not undertake governmental regulation of wages, hours, or working conditions. Instead it seeks to provide a means by which agreement may be reached with respect to them." *Terminal Assn.* v. *Brotherhood of Railroad Trainmen*, 318 U. S. 1, 6 (1943) (footnote omitted). It is clear to me that the duty to exert every reasonable effort was agreed upon to make effective the duty of the carrier to recognize the union chosen by the employees—in other words, it is essentially a corollary of the duty. Such a duty does not contemplate that governmental power should, after failure of the parties to reach accord, be added to the scales in favor of either party and thus compel the other to agree upon the aided party's terms. Rather, at that point, impasse was to free both parties

to resort to self-help. See *NLRB* v. *Insurance Agents' International,* 361 U. S. 477, 484–486 (1960). As Mr. Richberg had testified, "I wish to stress that one point above all others. We are seeking an opportunity to preserve self-government in industry. . . . We are not asking the Government to use force against one or the other party. We are simply asking aid and cooperation." Hearings 22.

Even apart from what the drafters of the Act representing both sides specifically contemplated, the result reached today will destroy entirely the carefully planned scheme of the Act. The Act is built upon a step-by-step framework. Each step is carefully drawn to introduce slightly different pressures upon the parties to reach settlement from the preceding step. First, the parties confer jointly. Next, the National Mediation Board may add its pressure through mediation. Then, the President may call into effect both the great power of his office and that of informed public opinion through the creation of an emergency board. Underlying the entire statutory framework is the pressure born of the knowledge that in the final instance traditional self-help economic pressure may be brought to bear if the statutory mechanism does not produce agreement. The Act does not evidence an intention to return to any step once completed. The Court's decision will effectively destroy the scheme of gradually escalating pressures. Moreover, the Court provides absolutely no guidance as to where in the bargaining scheme the parties are to be remanded. Does the court send them back to the Mediation Board which has already terminated jurisdiction finding the parties to have reached impasse? Should the court remand to some other phase of the proceedings? If so, where?

More important, however, is the mortal wound today's holding inflicts on the critical role to be played by the

presence of economic weapons in reserve. *NLRB* v. *Insurance Agents' International, supra,* at 488–489. As the statutory machinery nears termination without achieving settlement, the threat of economic self-help and the pressures of informed public opinion create new impetus toward compromise and agreement. If self-help can now effectively be thwarted by injunction and by drawn-out court proceedings after the termination of the entire bargaining process, or worse yet, at each step thereof, the threat of its use becomes impotent, indeed.

Since there is no specific mandate for an injunction in the circumstances presented by this case, the more general provisions of the Norris-LaGuardia Act are applicable. *Virginian R. Co.* v. *System Federation No. 40,* 300 U. S., at 563; *Brotherhood of Railroad Trainmen* v. *Chicago R. & I. R. Co.,* 353 U. S. 30, 40–41 (1957).

> "The Norris-LaGuardia Act, 47 Stat. 70, 29 U. S. C. §§ 101–115, expresses a basic policy against the injunction of activities of labor unions. We have held that the Act does not deprive the federal courts of jurisdiction to enjoin compliance with various mandates of the Railway Labor Act. *Virginian R. Co.* v. *System Federation,* 300 U. S. 515; *Graham* v. *Brotherhood of Locomotive Firemen & Enginemen,* 338 U. S. 232. However, the policy of the Act suggests that the courts should hesitate to fix upon the injunctive remedy for breaches of duty owing under the labor laws unless that remedy alone can effectively guard the plaintiff's right." *International Association of Machinists* v. *Street,* 367 U. S., at 772–773.

My conclusion, then, is that the Railway Labor Act as designed by its coframers and as enforced by this Court

excludes any role for the judiciary to oversee the relative efforts of the parties in their mutual attempt to reach settlement. A court may order the parties to recognize one another and sit down to bargain, but upon failure of the statutory machinery to induce settlement, the judiciary is denied power to enjoin resort to traditional self-help measures. If this scheme has proved ineffective, Congress, not this Court, must redress the deficiencies.

I would affirm.