CONSOLIDATED RAIL CORPORA-
TION, Plaintiff-Appellee,

v.

BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYEES, and O.M. Berge, President-BMWE, W.E. LaRue, Vice President-BMWE, J. Dodd, General Chairman-BMWE, J. Cassese, General Chairman-BMWE, C.C. Davison, General Chairman-BMWE, P.W. Mac-Queen, Assistant General Chairman-BMWE, John Doe, Defendants-Appellants.

No. 1379, Docket 86–7289.

United States Court of Appeals,
Second Circuit.

Argued May 15, 1986.
Decided June 5, 1986.

Louis P. Malone, Gen. Counsel, Broth. of Maintenance of Way Employees, Washington, D.C. (James L. Linsey, John S. Bishop, Michael Barrett, Cohen, Weiss & Simon, New York City, of counsel), for defendants-appellants.

Dennis A. Arouca, Philadelphia, Pa. (Robert S. Hawkins, Pepper, Hamilton & Scheetz, Nixon, Hargrave, Devans & Doyle, Rochester, N.Y., Lucy S.L. Amerman, Cary A. Metz, John B. Rossi, Consol. Rail Corp., of counsel), for plaintiff-appellee.

Before KAUFMAN, CARDAMONE and WINTER, Circuit Judges.

PER CURIAM:

In April 1984, the Brotherhood of Maintenance of Way Employees ("BMWE" or the "Union") notified the Maine Central Railroad and the Portland Terminal Company that the Union wished to negotiate changes in wages and working conditions, pursuant to the Railroad Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.* After almost two years of negotiations, BMWE exhausted the elaborate bargaining procedures mandated by 45 U.S.C. §§ 155, 156. The Union subsequently commenced a lawful strike against the railroads and their parent company, Guilford Transportation Industries ("Guilford").

To enhance the bargaining position of its striking members, BMWE also sought to picket various rail carriers as secondary employers who provided direct and indirect assistance to Guilford or its subsidiaries. One such carrier was Consolidated Rail Corporation ("Conrail"). Conrail interchanges traffic with the Delaware & Hudson Railroad and the Boston & Maine Railroad, two Guilford subsidiaries.

BMWE notified Conrail of its plans by telegram. Conrail thereupon obtained a preliminary injunction from the United States District Court for the Western District of New York, enjoining the Union from commencing its picketing of Conrail. The district judge acknowledged the facial applicability of the Norris-LaGuardia Act, 29 U.S.C. 101 *et seq.*, which generally deprives federal courts of jurisdiction to issue injunctive relief in labor disputes. The district court, however, believed the Union had a duty to exhaust RLA negotiation procedures with Conrail, the secondary employer, in addition to those transacted with the primary employer. Judge Telesca based his analysis on the perceived "primary purpose" of the RLA—avoidance of disruption to interstate rail transport. This expedited appeal followed. After oral argument, we stayed the injunction pending the outcome of this appeal. We now vacate the order of the district court granting the preliminary injunction.

The issue here is whether the BMWE must exhaust the virtually interminable RLA negotiation procedures with a secondary employer. We hold that the Union is under no such obligation. This supposed duty, therefore, cannot serve as a basis for an exception to the dictates of the Norris-LaGuardia Act. A contrary result would lead to the freewheeling judicial interference that the Act was meant to prevent. *See Chicago & North Western Ry. Co. v. United Transportation, Inc.*, 402 U.S. 570, 582, 91 S.Ct. 1731, 1738, 29 L.Ed.2d 187 (1971) (RLA exception to Norris-LaGuardia Act must be narrowly drawn). Accordingly, we decline to remove from the Union's self-help arsenal a lawful and potent weapon—peaceful picketing. Unlike the National Labor Relations Act, 29 U.S.C. § 158(b)(4), the RLA does not ban secondary activity. *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 378–79, 89 S.Ct. 1109, 1115–16, 22 L.Ed.2d 344 (1969).

We draw support for our conclusion from the specific language of the RLA, which imposes the duty to negotiate on "carriers and the employees *thereof.*" 45 U.S.C. § 152, First (emphasis added); *see generally* Note, *Judicial Approaches to Secondary Boycotts under the Railway Labor Act*, 42 N.Y.U.L.Rev. 928, (1962) ("[T]he language of the statute restricts the [Mediation] Board's jurisdiction to disputes between a carrier and *its* employees.")

More significantly, the general statutory scheme also supports our conclusion. The RLA mediation procedures are designed to be lengthy. To impose them upon secondary disputants would effectively deprive unions of the right to engage in secondary

picketing, for the underlying primary dispute would often be more speedily resolved. Moreover, the RLA also provides for Presidential appointment of an emergency board to investigate a strike that threatens to disrupt substantially interstate commerce. 45 U.S.C. § 160. Congress, therefore, did not envision an active judicial role in this area.

Finally, we note that other courts have been reluctant to ignore the clear strictures of the Norris-LaGuardia Act in favor of a vague duty to negotiate not clearly expressed in the RLA. *See, e.g., Central Vermont Ry. v. BMWE*, 639 F.Supp. 220 (D.D.C.1986), *aff'd*, 793 F.2d 1298 (D.C.Cir. 1986); *Richmond, F. & P. Ry. v. BMWE*, No. 86–3544 (4th Cir. May 5, 1986) (vacated injunction pending appeal); *Western Maryland R.R. v. System Bd. of Adjustment*, 465 F.Supp. 963, 968 (D.Md.1979).

Accordingly, the order of the district court is vacated.