JERRY E. SMITH, Circuit Judge:
I.
A union appeals an injunction issued under the Railway Labor Act (“RLA”). The six appellee railroad carriers have obtained, on summary judgment, an injunction against appellant Brotherhood of Maintenance of Way Employees (“BMWE”) requiring it to give ten days’ notice before initiating a “strike, work stoppage, picketing or other self help” against any of the carriers. Burlington N., Santa Fe Ry. v. BMWE, 143 F.Supp.2d 672, 696 (N.D.Tex.2001) ("Burlington Northern”). In that published Memorandum Opinion and Order, the district court provides an impressive and detailed evaluation of the facts and law and a persuasive explanation of its reasons for entering the injunction. Finding no error, we affirm, essentially on the basis of the district court’s well-crafted opinion, except to the extent that we provide further analysis below.
As the district court found, the BMWE has a long history of launching strikes without warning, including many that are illegal under the RLA. See id. at 694 (finding that “[t]he court can, and does, infer from the facts thus found that BMWE has a pattern, practice, and policy of authorizing, encouraging, permitting, *805 calling or engaging in strikes, work stoppages, picketing, and other self-help against plaintiffs and their subsidiaries over what BMWE claims are unilateral changes in agreements.... [T]he conduct of the BMWE in engaging in activities of that kind without giving the affected carrier advance notice ... violate[s] BMWE’s duties under § 152 First.”). Since 1993, “BMWE has struck, attempted to strike, or threatened to strike plaintiffs at least eighteen times, including nine cases in which pickets went up and/or operations were disrupted until the affected plaintiff was able to obtain a temporary restraining order.” Id. at 679.
In the year preceding the injunction, “BMWE ... accelerated its practice of strikes against the plaintiffs, with four incidents” between February 2000 and early 2001. Id. “In each case, BMWE planned its strike in secret and made every effort to implement the strike before the affected carrier could obtain a temporary restraining order.” Id.[1]
BMWE claims that its policy of surprise strikes does not violate the RLA and that the injunction is forbidden by the Norris-LaGuardia Act (“NLGA”). We conclude that the BMWE’s actions violated its duties under the RLA and that the NLGA does not bar an injunction under the specific circumstances of this case.
II.
A.
We first consider the BMWE’s duties under the RLA. It is well established that “the major purpose of Congress in passing the Railway Labor Act was to provide a machinery to prevent strikes.” Tex. & New Orleans R.R. v. Bhd. of Ry. & Steamship Clerks, 281 U.S. 548, 565, 50 S.Ct. 427, 74 L.Ed. 1034 (1930) (quotations omitted). To further this goal, § 152 First of the RLA comprehensively requires that labor and management “exert every reasonable effort ... to settle all disputes ... in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.” 45 U.S.C. § 152 First (1994) (emphasis added). “[T]he obligation under § [152] First is central to the effective working of the Railway Labor Act,” and compliance therefore can be enforced by injunction. Chicago & N.W. Ry. v. United Transp. Union, 402 U.S. 570, 578-79, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971).
BMWE contends that the legislative history of the RLA mandates a narrower construction of the RLA than the text alone would dictate. Even if the BMWE’s view of the legislative history is sound, this argument is unavailing, because “[l]egislative history is relegated to a secondary source behind the language of the statute in determining congressional intent; even in its secondary role legislative history must be used cautiously.” Aviall Serv., Inc. v. Cooper Indus., Inc., 263 F.3d 134, 140-41 (5th Cir.) (internal citations omitted), vacated for rehearing en banc, 278 F.3d 416 (5th Cir.2001).[2]
*806 BMWE’s deliberate policy of repeatedly calling surprise strikes violates the statutory requirement that railroads and unions “exert every reasonable effort ... to settle all disputes ... in order to avoid any interruption to commerce.” 45 U.S.C. § 152 First. A surprise strike makes it difficult or impossible to resolve the underlying dispute between labor and management without “interruption to commerce.” Id. Because management is unaware that a strike is impending, it cannot take steps that might prevent it. In cases where the contemplated surprise strike is illegal under the RLA, the carrier cannot obtain an injunction against it until after the strike has begun and an “interruption to commerce” has already occurred.
In addition to violating § 152 First, many of BMWE’s surprise strikes were held to be in violation of the requirement that unions can resort to strikes in a dispute over “minor” issues only if they first have exhausted the RLA’s compulsory dispute resolution mechanisms. Burlington Northern, 143 F.Supp.2d at 680-85 (describing seven cases in which BMWE was enjoined from striking the appellees because the dispute at issue was minor).[3] This circumstances strengthens the conclusion that BMWE was engaged in a pattern of illegal activity.
B.
Precedent from other circuits supports this conclusion. Judge Leventhal, writing for the District of Columbia Circuit, held that “the continuing duty of responsible bargaining under the [RLA] fairly embraces reasonable notice of a strike or lockout or other self help.” Del. & Hudson Ry. v. United Transp. Union, 450 F.2d 603, 622 (D.C.Cir.1971). BMWE’s argument that Delaware & Hudson was not decided under § 152 First is irrelevant, because the reasoning of the court is based on a generalized RLA “duty of responsible bargaining” that applies to § 152 First as readily as to other provisions of the Act.[4] Id.
The Eleventh Circuit recently has held that “[w]hen the public interest, commerce, and a clear statutory provision are implicated, we will not shy away from holding the parties to their duties under the RLA so as to avoid ‘any interruption to *807 commerce.’ ” Delta Air Lines, Inc. v. Air Line Pilots Ass’n, Int’l, 238 F.3d 1300, 1308 (11th Cir.) (quoting § 152 First), cert. denied, 532 U.S. 1019, 121 S.Ct. 1958, 149 L.Ed.2d 754 (2001). That court held that § 152 First’s requirement that the parties “exert every reasonable effort to make and maintain” agreements qualified as a “clear statutory provision” that could be enforced by injunction whenever there is a threat of “any interruption to commerce.” Id. The same reasoning applies to the section’s mandate that labor and management “exert every reasonable effort ... to settle all disputes ... in order to avoid any interruption to commerce,” which occurs in the same sentence of § 152 First as does the provision enforced by the Eleventh Circuit.
Because we are persuaded by the plain text of the statute, by the reasoning of the District of Columbia and Eleventh Circuits, and by the desirability of avoiding a circuit split, we easily conclude that the BMWE did indeed violate its statutory duties under § 152 First. We need not, however, go as far as the District of Columbia Circuit did in concluding that any “deliberate timing of a strike without prior warning” violates the statute. Delaware & Hudson, 450 F.2d at 622. For purposes of the present case, we decide only that the statute forbids an ongoing, repeated practice of surprise strikes that are doomed later to be held illegal and enjoined. See Burlington Northern, 143 F.Supp.2d at 679-85 (describing extensive history of surprise strikes by the BMWE against appellees that later were enjoined). We need not and do not address the question whether the RLA forbids all surprise strikes. Nor do we need to reach the Eleventh Circuit’s holding that anti-strike injunctions are appropriate any time a union’s violation of a “clear statutory provision” threatens “interruption to commerce.” Delta, 238 F.3d at 1308.
C.
BMWE argues that recognizing an en-joinable statutory duty to avoid surprise strikes under § 152 First also would allow courts to enjoin a variety of other union and management practices that arguably evidence a failure to “exert every reasonable effort ... to settle all disputes.” 45 U.S.C. § 152 First. For example, BMWE claims that a broad interpretation of § 152 First would allow courts to enjoin carriers’ refusals to settle a minor dispute or to maintain the status quo pending arbitration.
These and other similar examples are readily distinguishable from surprise strikes, because § 152 First applies only to actions that cause “interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.” 45 U.S.C. § 152 First. The actions posited by BMWE, while they may make dispute resolution more difficult, do not, in and of themselves, interrupt - commerce, while surprise strikes undeniably do. And strike prevention, not dispute resolution per se, was “the major purpose of Congress in passing the Railway Labor Act.” Texas & New Orleans, 281 U.S. at 565, 50 S.Ct. 427.
III.
A.
Having concluded that the BMWE’s actions violated the RLA, we turn to the question whether the injunction is barred by the NLGA. That statute “expresses a basic policy against the injunction of the activities of labor unions.” Int’l Ass’n of Machinists v. Street, 367 U.S. 740, 772, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961) (citing 29 U.S.C. § 101). Nonetheless, “the [NLGA] does not deprive the federal courts of jurisdiction to *808 enjoin compliance with various mandates of the Railway Labor Act.” Id.
When considering requests for injunctive relief under the RLA, “courts should hesitate to fix upon the injunctive remedy unless that remedy alone can effectively guard the plaintiffs right.” Chicago & North Western, 402 U.S. at 582, 91 S.Ct. 1731. The Supreme Court, however, also has said that the NLGA does not bar injunctive relief under § 152 First, reasoning that “[w]e find it quite impossible to say that no set of circumstances could arise where a strike injunction is the only practical, effective means of enforcing the command of § [152] First.” Id.
BMWE’s strategy of calling numerous surprise strikes is precisely the sort of violation of the RLA for which an injunction “is the only practical, effective” remedy. Id. BMWE repeatedly has demonstrated its willingness to call surprise strikes that violate its obligations under the RLA. Normally, such illegal conduct could be deterred through after-the-fact actions for damages. This court, though, specifically has held that there is no damage remedy for violations of § 152 First. See Burlington N. R.R. v. BMWE, 961 F.2d 86, 89 (5th Cir.1992); Louisville & Nashville R. Co. v. Brown, 252 F.2d 149, 155 (5th Cir.1958).
Preemptive injunctive relief is the only available remedy for illegal surprise strikes by the BMWE. An injunction issued only after an illegal strike has begun cannot undo the damage caused to the carriers from the beginning of the strike to the issuance of the injunction.
More importantly, an after-the-fact injunction cannot prevent the “interruption of commerce” that will have occurred during this period; stopping such disruption is, as we have seen, the main purpose of the RLA. 45 U.S.C. § 152 First. Finally, after-the-fact injunctions would not give the BMWE any incentive to refrain from illegal strikes in the first place, because it still would receive the benefit of any damage to the carriers inflicted before the injunction went into effect.
To be sure, the district court could have chosen to enjoin only unambiguously illegal surprise strikes — those that are over “minor” issues. But if the carrier learns of the strike only after the fact, it cannot litigate the “major-minor” issue until after the strike has begun. At that point, if the carriers prevail in court, they still will not receive compensation for the disruption of operations inflicted by the strike while it lasted.
The case might well be different if the BMWE had not utilized illegal surprise strikes on so many occasions. If such tactics were limited to rare, isolated instances, there might be no need for an injunction to address the problem, which would be unlikely to recur. In the present case, however, a long history of systematic abuse left the district court with no choice but to resort to an injunctive remedy. There was no other way to prevent the extensive disruption of commerce and damage to the carriers caused by an ongoing policy of surprise strikes.
B.
BMWE argues, nonetheless, that, under the NLGA, the injunction is improper in light of United States Steel Corp. v. United Mine Workers, 519 F.2d 1236 (5th Cir.1975). There, we did indeed condemn “overbroad use” of anti-strike injunctions; we required that “[e]very order granting an [anti-strike] injunction ... shall be specific in its terms, shall describe in reasonable detail, and not by reference to the complaint or other document the act or acts sought to be restrained.” Id. at 1245-46.
United States Steel is readily distinguishable from the present case. The in *809 junction against BMWE is much less sweeping than that in United States Steel, which “was nothing less than an injunction against striking for the life of the con-tractf,] an order to work every day.” United States Steel, 519 F.2d at 1245. Here, the court merely required ten days’ notice of a strike and did not come close to enjoining the right to strike itself.
Second, United States Steel is distinguishable because it was decided under Supreme Court precedent that forbids enjoining any strike under the Taft-Hartley Act absent “a finding in each case that the strike was over an arbitrable issue.” Id. There is no such requirement under the RLA.
United States Steel’s requirement that “[ejvery order granting an [anti-strike] injunction ... shall be specific in its terms [and] shall describe in reasonable detail ... act or acts sought to be restrained,” id. at 1245-46, presumably is still applicable to the present case. The injunction does not run afoul of it, however. The injunction undeniably is “specific in its terms,” requiring that the union provide ten days’ notice of all strikes against the plaintiff carriers. Id. Unlike the situation in United States Steel, in which there was “no specific act ... complained of in the motion for ... injunction,” here the carriers complain of a longstanding BMWE strategy of calling surprise strikes that violate the RLA. Id. at 1246.
IV.
In summary, BMWE has persisted in undermining the purposes of the RLA by repeatedly engaging in strikes that are plainly unlawful. The district court has carefully tailored a remedy designed to take care of this specific factual situation. Following the lead of two sister circuits that have approved the availability of injunctions to thwart similar violations of law, we AFFIRM the judgment of permanent injunction.

. The district court made these factual findings without an evidentiary hearing; it provides a detailed description of the undisputed summary judgment evidence supporting its ruling. Burlington Northern, 143 F.Supp.2d at 678-85. We do not consider whether this was error, because BMWE does not raise the issue as a ground for reversal. "We liberally construe briefs in determining issues presented for review; however, issues not raised at all are waived.” Carmon v. Lubrizol Corp., 17 F.3d 791, 794 (5th Cir.1994).

. Cf. Garcia v. United States, 469 U.S. 70, 75, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984) (holding that “only the most extraordinary showing of contrary intentions would justify a limitation *806 on the 'plain meaning’ of the statutory language”).

. See Burlington N.R.R. v. BMWE, 961 F.2d 86, 89 (5th Cir.1992) (describing RLA dispute resolution procedures for "minor” disputes and holding that resort to them before striking is mandatory).

. It is also incorrect to claim, as BMWE does, that Delaware & Hudson 's language requiring notice is mere dictum. The language occurs in the same part of the opinion as do the instructions to the district court, which had "continuing jurisdiction” over the dispute "for such further proceedings as may become appropriate, not inconsistent with the opinion of this Court.” Delaware & Hudson, 450 F.2d at 623.
The District of Columbia Circuit evidently expected that, although it had overturned an earlier injunction, an anti-strike injunction, possibly including a notice provision, might become necessary. Indeed, the language asserting a requirement of notice immediately follows the court's condemnation of an earlier union effort to "call a strike ... without direct notice to the railroads.” Id. at 622.
The circuit court likely feared that such action might be repeated. It noted that the union’s earlier strike activity was "lawful” only because of "an assumption of good faith as to its stated purpose of the strike” and warned that "[t]he District Court has continuing jurisdiction to reappraise the union's good faith in the light of either substantial evidence not previously available or developments as to tactics and methods following notice to the carriers of the strike call." Id. at 623 (emphasis added). The latter passage suggests that the circuit court may have expected that the district court would not allow future strikes without prior "notice to the carriers of the strike call.” Id.