In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.

In re CREW-CONSIST CONTROVERSY with UNITED TRANSPORTATION UNION (UTU).

No. 70–347.

United States District Court, E. D. Pennsylvania.

July 14, 1972.

Covington & Burling by Charles Horsky, Washington, D. C., Blank, Rome, Klaus & Comisky by Marvin Comisky; Dennis Faucher, Ralph Pickard, Robert W. Blanchette and Edwin K. Taylor, Philadelphia, Pa., for Trustees, Penn Central Transportation Co.

Sullivan & Worcester by Joseph Auerbach, Boston, Mass., Tate & Ervin by Spencer Ervin, Jr., Philadelphia, Pa., for Richard Joyce Smith, Trustee, New York, New Haven & Hartford Railroad.

Cornelius C. O'Brien, Jr., Philadelphia, Pa., for Beatrice Brown.

Kelley, Drye, Warren, Clark, Carr & Ellis by Edward Roberts, III, and Robert L. Crawford, New York City, for Manufacturers Hanover Trust Co., as indenture trustee.

Ballard, Spahr, Andrews & Ingersoll by Richardson Blair, Alan S. Fellheimer, Philadelphia, Pa., for Girard Trust Bank.

Ballard, Spahr, Andrews & Ingersoll by Frederic L. Ballard, and Alan S. Fellheimer, Philadelphia, Pa., for Morgan Guaranty Trust Co., as R & I indenture trustee.

Fox, Rothschild, O'Brien & Frankel by Nochem S. Winnet, Philadelphia, Pa., for First National City Bank of New York.

White & Case by Robert L. Clare, III, New York City, for Bankers Trust Co. and Morgan Guaranty Trust Co. of New York, as trustee of the Lake Shore collateral mortgages.

Davis, Polk & Wardwell by John R. Leekley, New York City, for Morgan Guaranty Trust Co. of New York, as Harlem indenture trustee.

Wolf, Block, Schorr & Solis-Cohen by Michael L. Temin, Philadelphia, Pa., for First Pennsylvania Banking & Trust Co., as indenture trustee.

Morgan, Lewis & Bockius by John N. Schaeffer, Jr., Philadelphia, Pa., for The Fidelity Bank.

Willkie, Farr & Gallagher by Walter H. Brown, Jr., New York City, for Institutional Investors, Penn Central Group.

## OPINION IN SUPPORT OF ORDER NO. 830

FULLAM, District Judge.

The Trustees' "Petition . . . for a Hearing on the Status of the Crew Consist Controversy" (Document No. 3751) presents issues of crucial significance to this reorganization and the future viability of Penn Central. Specifically, the question to be decided is what actions the Trustees should be permitted to take in order to achieve final resolution of the long-standing dispute over the number of employees needed to operate trains.

## I. DEFINITION OF TERMS

The basic controversy over attempts to reduce operating costs by eliminating allegedly excessive employees is essentially divisible into two parts: disputes concerning the size of the crews of locomotives (specifically, the necessity of employing firemen on diesel locomotives); and the size of the crews of trains, as distinguished from locomotive crews. The former, generally designated as the "fireman manning" dispute, is being handled through industry-wide bargaining;[1] the latter, generally designated as the "crew consist" dispute, is the only aspect of the controversy involved in this proceeding. The term "trainmen" is used herein generically to designate all persons (approximately 18,800 in number) employed by the Debtor on crews of trains, as distinguished from locomotives. The job assignments included within the term "trainmen" are conductors, assistant conductors, ticket collectors, baggagemen, brakemen, flagmen, foremen, helpers, etc.

The heart of the present dispute is whether the appropriate crew consist should be "one and one" or "one and two" (*i. e.*, one conductor/foreman and one brakeman/helper, or one conductor/foreman and two or more brakemen/helpers).

## II. PARTIES TO THE CREW CONSIST CONTROVERSY

The employees involved in the present dispute are represented by the United Transportation Union (hereinafter UTU), which came into being on January 1, 1969, in consequence of the merger of the Brotherhood of Railroad Trainmen, the Brotherhood of Locomotive Firemen and Engineers, the Order of Railway Conductors and Brakemen, and the Switchmen's Union of North America. For labor-management purposes, the Debtor's railroad is divided into 10 geographical districts, in each of which the union is represented by a general chair-

---

1. The Court has been advised informally that resolution of this dispute appears imminent.

man (and, of course, various subsidiary union officials.)

The present dispute involves proposed changes in nine collective bargaining agreements, one for each division (one agreement covers two divisions). All of these agreements incorporate the terms of the "Luna-Saunders Agreement" (discussed below), which establishes a minimum crew consist of one-and-two.

Pursuant to Order No. 134 herein, the Congress of Railway Unions has intervened in the reorganization proceedings on behalf of all labor organizations representing the Debtor's employees, including the UTU.

## III.  BACKGROUND OF THE CREW CONSIST DISPUTE

The present controversy stems from the long-standing failure to resolve issues arising from the inherent conflict between technological advancement and maintenance of levels of employment. It has long been the view of railroad management in general that much of the work formerly required of trainmen (e. g., manual control of brakes, visual checks of the wheels to detect overheating, manual passing of signals, and, in some situations, loading and unloading of freight cars) is now being performed automatically ("hot box detectors," centrally controlled braking systems, automatic signals, radio communications, yard modernization, etc.); and that, with respect to a substantial majority of trains, the work can be performed safely and without undue burden by a crew consisting of a conductor and one additional trainman.

Traditionally, management has contended that crew size should be determined by management, in its sole discretion. In general, the unions have contended that reductions in crew size would be incompatible with safe operations, and would impose excessive work loads upon remaining crew members; that determinations of the proper crew consist must be made separately for each train, in order to give adequate consideration to varying circumstances; and

that all such determinations should be made jointly by management and labor, through collective bargaining.

For present purposes, it will suffice to sketch briefly only the relatively recent history of the controversy.

On November 2, 1959, on a nationwide basis, the railroads served Section 6 notices proposing the elimination of existing rules on the subject of crew consist in road and yard service, and proposing that management be given the right to establish crew sizes. Ten months later the unions submitted counter-proposals seeking to establish minimum crews of one and two. There were a great many other unresolved issues between management and labor at the time. Both sides agreed to submit all of these issues to an independent commission for study and recommendation. Pursuant to executive order, the Presidential Railroad Commission was created on November 1, 1960; it was composed of an equal number of public, railroad, and union members. After lengthy public hearings and field inspection trips, the Commission issued its report on February 28, 1962.

With respect to the crew consist issue, the Commission found that there was substantial overmanning (although perhaps not as much as the railroads contended); that the determining factors in each case should be safety and avoidance of excessive work loads; that all crew consist disputes should be resolved locally through collective bargaining, culminating in binding arbitration of each dispute that was not settled within 60 days; and that reasonable job protection should be provided for employees adversely affected.

After the Commission rendered its report, further efforts to mediate a settlement were unsuccessful, and Emergency Board No. 154 was established pursuant to the Railway Labor Act. The recommendations of Board 154 generally tracked those of the Commission, but added the further recommendation that reductions in crew consist should be accomplished through attrition. The rail-

roads accepted these recommendations, the unions did not. Extensive further negotiations failed to produce a settlement of the controversy.

On August 28, 1963, Congress enacted Public Law 88–108, 77 Stat. 132, creating Arbitration Board No. 282 to render a binding decision of the crew consist (and fireman manning) issues. This Board rendered its decision, effective January 25, 1964, and remaining in effect for two years, expiring on January 25, 1966. The award mandated local determinations of crew consist disputes, with provision for binding determinations by special boards of adjustment; again, the sole criteria were safety and work load, and any reductions were to be accomplished through natural attrition.

During the two-year period in which the award of Board No. 282 remained in effect, there were 94 crew consist agreements negotiated throughout the industry, and 96 decisions issued by special boards of adjustment. The special boards authorized elimination of approximately 87 percent of the jobs presented to them by the railroads. The combined effect of the awards and agreements was the temporary abolition of 8,020 jobs on 7,807 crews; approximately 75 percent of the one-and-two crews submitted were reduced to one-and-one. Insofar as the Debtor's predecessors were concerned, on the New York Central, five awards of special boards and one agreement resulted in elimination of 965 of the 1,127 jobs proposed by the railroad. The Pennsylvania Railroad did not submit any jobs to special adjustment boards; its proposals to abolish more than 2,200 jobs were terminated by a negotiated agreement reducing the size of 204 train crews temporarily for the period from May 8, 1965 to January 25, 1966, when the Board No. 282 award terminated and the "Luna-Saunders" agreement became effective.

For several reasons, the reductions accomplished pursuant to the award of Board No. 292 did not long survive the expiration of the two-year period of that award. For one thing, both the Presidential Commission and Board No. 282 had concluded that implementation of their recommendations could not relieve the parties from compliance with state "full-crew" laws; many railroads, including the Debtor's predecessors, felt that the unions' opposition to repeal of these laws presented an insuperable obstacle to any meaningful solution of the overmanning problem. Moreover, there was uncertainty and controversy as to whether reductions achieved during the two-year period would remain in effect after the expiration of the award on January 25, 1966. The unions contended that all crews reduced during that period would revert to their former consist automatically at the expiration of the award, while the railroads argued that the award of Board 282 modified the collective bargaining agreements, and that these modifications would remain in effect unless and until altered pursuant to the Railway Labor Act.

Most of the eastern railroads, including the Debtor's predecessors, resolved these problems by entering into the "Luna-Saunders" agreement, effective January 25, 1966. Under this agreement, the railroads bargained away any rights to further benefits of award 282 and agreed to a minimum crew consist of one-and-two for a period of at least five years, in exchange for the unions' agreement to withdraw their opposition to repeal of the state full-crews laws.[2]

2. While not presently pertinent, in the interests of completeness, it should be mentioned that there was protracted litigation over the correct interpretation and effect of award 282, culminating in a judicial determination that the reductions made pursuant to the award remained in effect unless and until changed pursuant to the Railway Labor Act. A group of southern railroads entered into the "Jacksonville memorandum" the ultimate consequence of which was the restoration of approximately 85 percent of the one-and-one crews to one-and-two consist. The same kind of settlement was eventually achieved on all but one of the remaining railroads,

In the light of subsequent events, this exercise in summit diplomacy proved singularly unfortunate for the railroads, especially the Penn Central and its predecessors. The cost reductions anticipated to flow from repeal of the full-crew laws were long delayed; the equivalent of full-crew requirements continued in full or partial effect in New York until 1971, and in Indiana and Ohio until 1972, and remain in effect in Massachusetts. Prompt repeal of the full-crew laws would have produced savings at the rate of $34 million per year by 1971. Award 282 would have produced savings at the rate of $25 million in 1971. By bargaining away the latter in expectation of the former, Penn Central actually reduced its 1971 costs by only $3 million.

The Luna-Saunders agreement continued in effect until January 1, 1970, and thereafter unless and until modified pursuant to the "major disputes" provision of the Railway Labor Act. The petition now before the Court is an outgrowth of the Trustees' attempts to achieve such modification.

## IV. PROCEDURAL HISTORY OF THE PRESENT DISPUTE

The 26-page affidavit of Mr. John J. Maher, Vice President-Administration of the railroad, and the railroad's chief negotiator (Document No. 3791), sets forth the procedural history of this dispute. Briefly summarized, the following occurred:

After the parties, on January 1, 1971, became free to seek modification of the existing labor agreements, the railroad sought to negotiate the crew-consist issue, but made no progress. On June 7, 1971, the railroad served its Section 6 notices, proposing to eliminate all existing restrictions and to substitute a new rule providing that crew consists would be determined solely by management. Direct negotiations, pursuant to the Railway Labor Act, extended through

June, July and August, 1971, and were terminated by the railroad on September 7, 1971. Throughout this period, the railroad made clear its willingness to settle the crew consist controversy on any one of several alternative bases, including such possibilities as a rule specifying crew size, a procedure for determining crew size with finality, or any other arrangement which would settle the controversy promptly and on its merits. During this same period, the union served various notices on the railroad, proposing to increase the number of road and yard trainmen to be assigned to crews.

Initially, there was confusion and uncertainty as to whether the controversy was to be negotiated on a systemwide basis, or separately with each of the 10 general chairmen of the union, representing the 10 geographical districts of the railroad. At the first meeting on June 16, three general chairmen were in attendance, all of whom suggested and agreed that the matter should be handled through the President of the union. It was agreed that a further negotiating session would be held on June 30, and that in the meantime, all 10 general chairmen would hold a meeting, and the President of the railroad would meet with the President of the union to discuss the procedural problems. At the meeting between the two Presidents, on June 23, 1971, the union President stated that he wished to leave the decision as to the method of handling the case to the vote of all of the general chairmen involved.

At the next negotiating session on June 30, only five general chairmen were present. They stated that they could not agree to any systemwide handling of the dispute, and that each general chairman could speak only for the employees he represented. All further conferences were held on that basis.

Throughout the entire period, it was understood by both parties that the rail-

by reason of a series of "whipsaw" strikes in 1968. In the case of the Chicago and Northwestern, litigation is still pending.

road proposed to implement all reductions in crew size by attrition, and not to alter existing arrangements for job security (approximately 92% of the employees who might be affected by the proposed crew consist reductions already are guaranteed lifetime job security). It was also made clear that the company was willing to institute the proposed reductions in crew size on a gradual basis, over a considerable period of time. Commencing at the June 30 meeting, the company made a series of specific proposals for reduction of crew consist on limited numbers of trains, on a trial basis. By way of illustration, these included such matters as (a) reduction of crew consist on specific trains which had been previously approved for reduction during the period when the Board 282 award was in effect; (b) increase crew consist, as proposed by the union, on 100 sample trains, and decrease crew consist on a like number of trains proposed by the railroad, and compare the results over a 90-day period; or (c) submit all crew consist disputes to regional boards of adjustment for local study and final decision. Various other specific proposals were made from time to time, in similar vein.

Except for its original Section 6 counter-notices, the union made no proposals at all, nor did it respond to any of the company's proposals. Ultimately, on September 10, 1971, the company terminated negotiations. Various general chairmen then invoked the services of the National Mediation Board, pursuant to Section 5 of the Railway Labor Act; and the railroad made a similar request in response, on September 29, 1971. Mediation commenced on November 17, 1971, and continued through December. At the December 14 session, it was agreed that mediation efforts would be resumed at the Board's headquarters in Washington on January 4, with all 10 general chairmen present. However, because of conflicting engagements, the general chairmen did not attend that meeting, and mediation did not resume until January 17. At that session, the

union representatives advised that they were unwilling to discuss the crew consist dispute unless and until various other unrelated matters were the subject of mediation procedures before the Board. This was arranged, and all disputes were scheduled for simultaneous and concurrent handling, beginning January 20. However, none of the 10 general chairmen attended that session, and the union insisted that mediation take place at six separate locations on the Penn Central property, rather than in Washington.

On January 21, the Mediation Board met in executive session, and thereafter announced that mediation would continue at the Board's headquarters in Washington, commencing on January 24. The railroad representatives attended, the union representatives did not. The union representatives advised the Mediation Board by telephone that they would not attend any further sessions in Washington.

Ultimately on February 1, 1972, the Board advised the parties that, in its opinion, further mediation would not be productive. Pursuant to Section 5 of the Railway Labor Act, the Board requested the parties to submit the dispute voluntarily to final and binding arbitration. The railroad accepted this offer on February 3; the union failed to take a position. In order to end the impasse thus created, the railroad ultimately, on March 1, 1972, withdrew its offer to arbitrate, whereupon the National Mediation Board formally terminated its services, thus beginning the running of the 30-day "status quo" period under the Act.

During the 30-day period, various further attempts were made to negotiate a settlement of the dispute, and the railroad made various additional offers, none of which was acceptable to the union.

On March 31, 1972, the President appointed Emergency Board No. 180, pursuant to Section 10 of the Railway Labor Act. The Board filed its report on

May 15, 1972. The meaning and effect of this report is now also a matter in controversy.

The report does not purport to deal with the controversy with finality. The Board suggests further negotiation, interim reports to the Board, and, if necessary, a further decision by the Board in January of 1973. Instead of making definite findings on the merits of the controversy, the Board, in an apparent attempt to encourage further negotiation, merely hinted at what its findings probably would be if it became necessary to reach a final decision. Understandably, the parties interpret these hints in different ways.

If the recommendations of the Emergency Board were to be accepted by both sides, the Board would continue in existence and the possibility of a final decision of the crew consist dispute would be postponed until at least January of 1973, unless the parties otherwise agreed in the interim. The railroad has not accepted the Board's recommendations. Shortly after the report was filed, the union purported to "accept" the Board's report as a basis for further negotiations, by a telegram directed to the appropriate officials. However, the report itself specifies, in recommendation No. 8: "These recommendations, if accepted by the parties, should be consummated by a stipulation to that effect." No such stipulation has been executed.[5]

On June 15, 1972, the Trustees filed the present petition, seeking a hearing to review the situation, and praying that "following said hearing the Court approve the decision of the Trustees to put in effect the new rule proposed in their Section 6 notice of June 7, 1971, and make such orders in the premises as it may deem appropriate." A hearing was held on June 26, 1972. Notice of the hearing was given to all parties to the reorganization proceeding, including the Congress of Railway Unions representing, *inter alia*, the UTU, and to the UTU itself. So far as the record discloses, neither the Congress of Railway Unions nor the UTU appeared at or participated in the hearing.

## V. THE OBLIGATION TO BARGAIN IN GOOD FAITH

██ It is clear that, notwithstanding formal exhaustion of the requirements of the Railway Labor Act, there is a continuing obligation on the parties to negotiate in good faith, and that a party may be barred from exercising self-help remedies after the expiration of the Railway Labor Act procedures, if he has failed to bargain in good faith during those proceedings. Chicago and Northwestern Ry. Co. v. UTU, 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971); Piedmont Aviation, Inc. v. Air Line Pilots Ass'n, 416 F.2d 633 (4th Cir. 1969). Since the union did not participate in the hearing in this Court, the issue of good faith bargaining on the part of the railroad might perhaps be decided by default.

However, there is in the record the brief filed on behalf of the UTU before Presidential Board No. 180, in which an argument is made that the railroad has failed to comply with its obligations in this regard; and there is reference in the record to a complaint filed by the UTU in the United States District Court for the District of Columbia (United Transportation Union v. Baker et al., Civil Action No. 1186–72) containing similar assertions. For these reasons, and in the exercise of this Court's supervisory power over the Trustees, I believe it is appropriate to decide whether the Trustees are barred from the relief they now seek by any antecedent or current breach of their obligation to bargain in good faith.

The facts set forth in the affidavit of Mr. Maher, summarized in Section IV

---

5. Pursuant to the informal suggestion of the Court, the parties have continued to negotiate in an attempt to agree upon such a stipulation; however, no significant progress has been made.

above, clearly demonstrate that there is no basis for charging the Trustees or the railroad with failure to bargain in good faith. The only ground for such a charge which can be derived from the UTU brief before the Emergency Board No. 180 is that the Trustees' eagerness to obtain a prompt resolution of the controversy indicates that the railroad had no desire to settle the case, but wished to create an artificial emergency in order to force Congressional action. This suggestion is totally unfounded.

More than 18 months have now gone by since the proposed changes were first advanced, and more than one year since the posting of the Section 6 notices. The crew consist issue has been debated and analyzed for many years; the issues, the positions of the parties, and the general nature of the underlying facts are all well known. Every impartial commission and board which has studied the matter has reached similar conclusions, viz., that there is substantial overmanning, and that crew consists should be determined by negotiations, with binding arbitration of unresolved cases.

■ The key subjects for negotiation were not complex or difficult: "Let us try to agree on the correct crew-consists, or on some yard-stick for making such determinations; if we cannot agree, let us at least agree to set up procedural machinery for resolving disputes on a case-by-case basis." The record shows that there has been ample opportunity to explore these subjects; that every reasonable effort has been made to reach agreement; and that the failure to agree is not chargeable to any lack of good-faith bargaining on the part of the railroad.

## VI. THE SITUATION OF PENN CENTRAL

After a period of severe negative cash-flow during the earlier stages of this reorganizatin, the situation has improved to the extent that, on a bankruptcy basis, the railroad is operating at an essentially break-even cash-flow. This result has been achieved through deferral of real estate taxes, leased line rentals, and, of course, interest on bonded indebtedness. Barring dramatic improvements or dramatic reversals, neither of which is anticipated, this means that the Debtor's estate is currently being eroded at the rate of at least $100 million annually (this figure does not include any allowance for deferred maintenance). As of December 31, 1971, erosion of the Debtor's estate amounted to approximately $225 million. *See* Report of Trustees on Reorganization Planning, dated February 15, 1972, page 7 (Document No. 2637). The Trustees assert that elimination of redundant trainmen would reduce annual operating costs by approximately $100 million, and that these reductions could be achieved through attrition by 1976. *See* Prehearing Brief of the Trustees before Emergency Board No. 180, p. 78 (Exhibit C to Affidavit of John J. Maher, Document No. 3791–A).

The Trustees' proposal for an acceptable plan of reorganization is based upon achieving, at minimum, annual income available for fixed charges at the rate of approximately $275 million, by 1976. This goal cannot possibly be reached unless labor costs are substantially reduced through elimination of excess jobs. The fact that reduction of labor costs is not the only prerequisite to achieving viability is presently irrelevant. The need for progress in several areas cannot justify failure to attempt to make progress in any one of them.

Moreover, substantial progress has been and is being made toward achievement of the other conditions specified by the Trustees.[6] And in any event, estab-

6. A proposed core railroad system of reduced configuration and adequately high-density traffic has been tentatively identified, and steps are being taken to achieve it. Through contractual arrangements with Amtrak and various state

lishment of a correct level of labor costs is an independently valid goal of the Trustees, irrespective of the success of this reorganization.

At this point, a digression is in order. Because, by happenstance, the amount of annual erosion of the Debtor's estate roughly equals the amount of annual cost-cutting the Trustees estimate they can achieve through reductions in crew-consists, it can be made to appear that organized labor is being charged with blame for Penn Central's bankruptcy, and that the entire burden of salvaging the enterprise is being shifted to the operating employees. Any such interpretation would be most unfortunate, and highly inaccurate.

It is the duty of unions to represent their members aggressively, in order to obtain for them the benefits to which they consider themselves entitled. Whether the present crew consists are justified or not, they were agreed to by management. If the Trustees are correct in their assertions, then unnecessary labor costs may have contributed somewhat to the railroad's bankruptcy; but this will mean simply that, by hindsight, management erred in agreeing to assume these costs.

Under the Trustees' proposals, few if any present employees would suffer detriment, and no position would be eliminated for future employees if doing so would be unsafe or impose excessive workloads on other crew-members. Thus the "cost" of salvaging the railroad would not be borne by the employees or their unions, except perhaps to the extent of reduced membership in the years ahead. If the projected cost-cutting is not achieved, then the "cost"

of salvaging the railroad will be borne by the stockholders and especially by the general creditors—including personal-injury claimants; more realistically, the "cost" would be the failure to salvage the enterprise, an eventuality which would certainly be disastrous for the employees as well as the creditors and the public generally.

Finally, it should be emphasized that no finding is made herein that the union has failed to negotiate in good faith (a matter as to which the record in this Court is inadequate), or that the union's contentions on the merits are erroneous. If any criticism of the union is implicit in this opinion, it is for its seeming unwillingness to agree to procedural machinery for final resolution of crew-consist disputes.[7] And even in this respect, the union is of course acting in accordance with its legal rights. But I find it difficult to perceive the reasoning behind this approach. Recognizing the traditional opposition to "compulsory arbitration," I suggest that final resolution of crew-consist issues by knowledgeable and impartial experts might be viewed in a different light than binding arbitration of wage disputes.

## VII. STATUTORY FRAMEWORK

The issues now before the Court bring into sharp focus a seeming contradiction, or at least ambivalence in legislative approach, between Section 77 of the Bankruptcy Act and the Railway Labor Act.

Section 77(n) of the Bankruptcy Act, 11 U.S.C. § 205(n), specifically provides that "no judge or trustee acting under this Act shall change the wages or working conditions of railroad employees

and local public bodies, the losses on passenger service are being reduced. And freight revenues are improving, particularly in "piggy-back" service.

7. As a courtesy to the Court, in connection with the further negotiations referred to in footnote 5, *supra*, the UTU has furnished the Court with a copy of its July 11 proposal for stipulating to effectuate the Board 180 recommenda-

tions. Under this proposal, there would be no assurance of interim relief from further hiring, and any crew-reductions which might be negotiated in the interim between the present time and January 1, 1973, would automatically be set aside unless agreement had been reached on all crews by that date. And the proposal contains no provision for finality, but would be entirely voluntary.

except in the manner prescribed in the Railway Labor Act." This is in accord with the long-established rule in receiverships that a business in reorganization is not exempt from compliance with valid laws. Burke v. Morphy, 109 F.2d 572 (2d Cir. 1940); and *see* Gillis v. California, 293 U.S. 62, 66, 55 S.Ct. 4, 79 L. Ed. 199 (1934); Order of Ry. Conductors v. Pitney, 326 U.S. 561, 66 S.Ct. 322, 90 L.Ed. 318 (1946).

Underlying the provisions of Section 77 of the Bankruptcy Act is the principle that, in order to vindicate the public interest in continued rail service, the normal rights of creditors and investors may be held in suspension for a reasonable time in order to achieve reorganization, and upon reorganization may be drastically altered if necessary. Nevertheless, there are limits beyond which this public interest cannot be served without violating the constitutional prohibition against appropriation of private property for public use without just compensation. New Haven Inclusion Cases, 399 U.S. 392, 90 S.Ct. 2054, 26 L. Ed.2d 691 (1971); *cf.* Brooks-Scanlon Co. v. Railroad Commission of Louisiana, 251 U.S. 396, 40 S.Ct. 183, 64 L.Ed. 323 (1920). These limitations are measured both in terms of the amount of erosion of the Debtor's estate which can be permitted to occur before impairing liquidation value, and in terms of the length of time that is reasonable for assessing the ultimate prospects of achieving sufficient profitability to support a valid recapitalization of the enterprise. If there is sound support for a conclusion of ultimate profitability, interim erosion is less critical, except, of course, to the extent that it may require assurance of a greater degree of ultimate profitability because of the increase of priority debt which must be taken into account in the reorganization plan.

■ In the Railway Labor Act, Congress has espoused the principle that, in order to vindicate the public interest in continued rail service, without interruption caused by labor unrest, the parties should be required to negotiate all major disputes virtually interminably, free from the pressure of deadlines or the prospect of final and binding adjudication (except such as may ultimately be imposed by Congress itself, after the long process has resulted in failure). It was the view of Congress, and of the labor and industry leaders who jointly proposed the legislation that, since it was in the best interests of company and employees alike to prevent strikes, disputes over wages and working conditions would likely be settled amicably if the parties were restrained from exercising self-help, and required to negotiate.

It is a generally accepted fact, however, that the bargaining positions of railroads and unions are somewhat different. Changes in collective bargaining agreements likely to be sought by labor are generally amenable to retroactive application, and retroactivity has become an accepted feature thereof. Change likely to be sought by management, on the other hand, cannot usually be given retroactive effect. Moreover, only actual, rather than prospective, cost increases may be used to support increases in rates which, in turn, are prospective only. In addition, the recent history of railroads in this country justifies the suspicion that the long-range effects of many "amicable settlements" have actually been detrimental to both sides.

It is of course true that ultimately the parties can become free, under the Railway Labor Act, to exercise self-help remedies. Delaware & Hudson Railway Co. v. UTU, 146 U.S.App.D.C. 142, 450 F.2d 603 (1971). The usual pattern has been that, after all other avenues have been explored without success, the railroad announces its intention to put the change in effect, the union strikes or threatens to strike, and a Presidential Emergency Board is appointed. After further proceedings, the emergency board announces its recommendations, and the parties must maintain the *status quo* for a period of 30 days thereafter. Unless both sides accept the board's recommendations, the remedy of self-help is again available. A strike is called or threatened, and Congress is called upon to legislate a solution to the controversy.

Here again, the pressures upon the parties differ considerably. Railroads simply cannot afford strikes; revenues lost by reason of a strike cannot be retrieved. For example, cessation of operations by the Debtor would result in irretrievable loss of revenues at the rate of approximately $5½ million per day. Moreover, even the threat of a strike causes substantial losses, by reason of anticipatory diversion of freight. On the other hand, except for the consideration that it is not in the best interests of labor to jeopardize the economic stability of the railroad, there are no equivalent pressures upon the unions. Whatever partial reduction in income may result by reason of the difference between ordinary wages and strike benefits (largely financed by the company) is usually recovered eventually by retroactivity.

Thus, a railroad can obtain final resolution of a major dispute only at the risk of an actual or threatened strike, with attendant substantial losses. To a union, finality is not a pressing problem, and in any event can be obtained without incurring significant financial risks.

The problems are, of course, particularly acute in the case of a railroad which is in reorganization under Section 77 of the Bankruptcy Act. In the nature of things, such proceedings tend to be protracted, even after a seemingly feasible plan of reorganization has been proposed. Where, as in the present case, the feasibility of achieving a seemingly acceptable plan cannot be properly evaluated until a major dispute under the Railway Labor Act has been resolved, the thought that these built-in delays must be further compounded by delays in achieving finality in the resolution of the dispute is totally unacceptable.

What emerges from the foregoing analysis is not the conclusion that the mere existence of a crucial major dispute between labor and management makes reorganization impossible, or even that the Railway Labor Act is unworkable in a reorganization context; but rather, the inescapable conclusion that the procedures mandated by the Railway Labor Act should be expedited as much as possible, consistent with providing a fair opportunity for resolution of the dispute, and that, notwithstanding the exhaustion of Railway Labor Act procedures, every possible effort should be exerted toward establishing an acceptable mechanism for achieving a prompt, fair, and final decision of the controversy.

## VIII. CONCLUSIONS

On the basis of the entire record, including the various reports filed by the Trustees in this proceeding, and the various financial reports filed periodically, the briefs of the parties before Presidential Emergency Board 180, and the report of that Board, I have reached the following conclusions:

1. Determination of the size of a crew which can operate a train safely and without imposing excessive work loads should be made on the basis of individual analyses of trains or comparable groups of trains.

2. The sole criteria for determining crew consists should be (a) safety, and (b) avoidance of excessive work load.

3. Individual determinations of crew sizes are a proper subject for collective bargaining, and management decisions of such questions should be subject to challenge by the union and collective bargaining treatment.

4. There is little likelihood of achieving amicable resolution of any significant number of disputes involving crew consist issues except under arrangements which contemplate participation by impartial third parties, with ultimate resort to binding arbitration if no agreement is reached within a reasonable time.

5. There is a considerable amount of overmanning in trainmen positions on the Debtor's railroad.

6. Unless overmanning is eliminated promptly, it is highly doubtful that the Debtor can be successfully reorganized.

Nevertheless, present employees should not be deprived of the benefits of existing job protection, and reasonable job protection should be extended to all other present employees adversely affected.

7. There is no valid reason for deferring until a later date the establishment of machinery for determining with finality the correct size of individual train crews. This fundamental issue must be resolved forthwith, if there is to be any real hope of Penn Central's survival. The cost to the Debtor's estate of achieving elimination of overmanning on the basis of attrition can be justified only if, commencing promptly and continuing throughout the entire attrition period, there is in existence an adequate procedural mechanism for the fair and final determination of all disputes involving crew consist.

8. Approximately 92 percent of the employees of the Debtor who might be adversely affected by reductions in crew size are entitled to lifetime job protection under existing agreements. These protections should remain in effect. All other employees of the Debtor who might be adversely affected by reduction in crew size should be entitled to job protection for a period of time equal to the length of their employment by the Debtor, not to exceed six years. In addition, all employees who might be adversely affected by reductions in crew size should further be protected against forced transfers beyond the limits of their existing seniority districts.

9. In view of the job protection provisions outlined in the preceding paragraph, and the assurances against unsafe operation and excessive workloads embodied in the collective-bargaining-to-finality procedures outlined in previous paragraphs, elimination of overmanning would be consistent with safe operation and acceptable workloads, and would have no significant adverse effect upon job security. While there would ultimately be an adverse effect upon the union by reason of reductions in membership, this factor (a) cannot be accorded any significant weight in deciding the issues now before the Court, and

(b) in any event, would be eclipsed by the severe impact upon both the union and its members which failure of this reorganization would entail.

10. The Trustees have no realistic alternative except to pursue to final resolution their quest for the elimination of unnecessary jobs.

## IX. REMEDY

The initial decision which must be made is whether the Trustees should be directed to accept the recommendations of Emergency Board 180. Whatever may be said of the general merits of the Board's recommendations, there are two related reasons for concluding that unqualified acceptance by the Trustees should not be permitted.

■ In the first place, the Report proceeds on the assumption that, since the Trustees will not in any event be in a position to finalize their Plan of Reorganization until early 1973, it is not essential that machinery for final determinations of crew-consists be established until then. This assumption is unwarranted. Unless there can be some assurance that the process of determining reductions will begin forthwith, and thereafter proceed at a reasonable rate until all crews have been reviewed, and particularly that there is machinery for finality, the delay until January 1973 is unacceptable, in light of existing erosion. The delays inherent in the attrition approach are such that the process must begin immediately.

The second difficulty, related to the first, is that while the Board's recommendations seemingly contemplate immediate relief from further hiring, the UTU does not so construe them.

Accordingly, I have reluctantly concluded that, as matters now stand, the Trustees should not accept the Report of Board 180.

However, since neither side has anything to gain by insisting that this dispute be settled by Congressional action, and since it is self-evident that strikes or strike-threats would not benefit either side, I have concluded that the parties

should be encouraged and directed to negotiate further before the Trustees' promulgation is made effective, and that, if such negotiations fail, the Trustees' promulgation itself should include provisions assuring an opportunity for UTU participation in train-by-train determinations of crew-consists.

All of these directions have as their sole purpose the prompt establishment of appropriate procedures for, and ultimate achievement of, a just, fair and reasonably speedy resolution of the long-standing problem of crew-consists. The real tragedy would be to have the patient expire, not because the illness is fatal, but because the doctors are still arguing about who should make the final diagnosis.

For the reasons set forth in this Opinion, Order No. 830 has been entered, on July 12, 1972.

### ORDER No. 830

And now, this 12th day of July, 1972, in consideration of the petition of the Trustees for a hearing on the status of the crew consist controversy, and for approval of their decision to put in effect the new rule proposed in their Section 6 notice of June 7, 1971, and after hearing, it is hereby ordered:

The Trustees are authorized and instructed to establish and put into effect the train crew consist rule embodied in the notices served, pursuant to Section 6 of the Railway Labor Act, on June 7, 1971; provided, however, that if agreement on the crew consist issue is reached by the Trustees and the United Transportation Union prior to the date hereinafter indicated as the effective date for such rule, action in this matter will be postponed pending the Court's review of such agreement and its further order. It is further provided that the new crew consist rule shall be established and implemented consistently with these principles: that crew reductions be made only with due consideration to the effect of such reductions upon adequate and safe transportation service to the public and upon the interests of the

employees affected; that maximum reasonable effort be made to accomplish so much of the contemplated reduction in consist of crews as is possible by negotiation and agreement between the Trustees and the UTU; that the fullest practicable reliance be placed on the participation of independent third parties in the resolution of any differences between the Trustees and the UTU regarding the implementation of this rule; that appropriate reductions in consists of crews be made expeditiously with due regard to the needs and conditions of the Debtor estate; that trainmen in active service on the date of this Order be accorded job protection.

In recognition of these principles, it is ordered:

1. That the Trustees post appropriate notice of the establishment of the new rule at least 14 days prior to the date it is to become effective and that they make every reasonable effort to resolve the crew consist issue by negotiation during the notice period. The Trustees are instructed in this connection to proffer to the UTU their agreement to a procedure for implementing and administering the new crew consist rule either:

First:

(a) By the establishment within the 14-day notice period of a Standing Committee consisting of one or more representatives of the UTU, an equal representation of the Trustees, and a Chairman to be selected by mutual agreement of the other Committee members; with provision for the establishment, also, of similarly constructed sub-committees in each territory;

(b) By the conferring on this Standing Committee, by agreement, of authority and responsibility:

(i) to resolve within the four-month period following the effective date of the new rule issues which may arise in particular cases regarding the effect of proposed crew reductions upon adequate and safe transportation service to the public and upon the interests of the em-

ployees affected, with the understanding that this permit reductions in train crews at a rate roughly equivalent to the attrition rate during this period among employees affected by the new rule;

(ii) to set, so far as is possible during this period, guidelines for subsequent application of the safety and workload standards to other cases;

(iii) to advise the Court on or before November 30, 1972, regarding action taken in the implementation of the new rule and regarding the necessity, if any, of additional procedures providing an ultimate solution of the crew consist issue;

(iv) to consider and make recommendations to the UTU and to the Trustees regarding any matters of labor relations deemed beneficial to their mutual interests; or

Second:

By invoking for the resolution of this dispute the procedures of P.L. 89-456; or

Third:

In any comparable manner.

2. That if no agreement is reached under numbered paragraph 1 of this Order during the 14-day notice period, the Trustees shall proceed to implement the new crew consist rule in the following manner:

(a) The Superintendent of each Division of the Debtor will within seven days following the effective date of the new rule, notify his Local Chairman of crews which are proposed to be reduced, amounting to no more than 20 percent of the total crews in the Division. Subsequent similar lists shall be supplied at intervals of not less than 90 days.

(b) Each Superintendent will negotiate with the Local Chairman, if he shall so request, as to whether the crews thus listed can properly be reduced, considering safety of operations and workload of remaining crew members.

(c) If agreement is not reached within 30 days from the date when the Local Chairman was notified of the intention to reduce the consist of a crew, such reduction may thereafter be made effective by the Trustees.

(d) If upon the effectuation of such reduction the UTU challenges the Trustees' action through the procedures established in Section 3 of the Railway Labor Act or in Public Law 89-456 on the ground that such reduction has been made without due consideration to safety of operations and workload of remaining crew members, the Trustees shall accept the jurisdiction of the Adjustment Board or special Board of Adjustment and shall be bound by the award of such Board.

3. That trainmen entitled to protection under provisions of law or under existing job protection agreements shall be accorded such protection; that any trainman in active service on the date of this Order who is affected by a reduction in crew consist and who is not entitled to protection under provisions of law or under existing job protection agreements shall be accorded a period of protection equal to the length of his seniority as a trainman, but not in excess of six years; and that any trainman entitled to protection under this paragraph shall not be required to relocate beyond the limits of his prior right seniority district or working zone because of a reduction in any crew.

Any party may, on seven days' notice to those customarily notified and to the UTU, apply to the Court for interpretation, elaboration or modification of this Order.