WESTERN MARYLAND RR. CO.

v.

SYSTEM BOARD OF ADJUSTMENT
et al.

The BALTIMORE AND OHIO RR.
CO. et al.

v.

SYSTEM BOARD OF ADJUSTMENT
et al.

Civ. Nos. Y–78–1761, Y–78–1782.

United States District Court,
D. Maryland.

Jan. 23, 1979.

Joseph B. Geyer, H. Russell Smouse, Baltimore, Md., William F. Sheehan, Washington, D. C., for plaintiffs.

Mitchell M. Kraus, Rockville, Md., Irving Schwartzman, Baltimore, Md., for defendants.

## MEMORANDUM OPINION

JOSEPH H. YOUNG, District Judge.

The Baltimore and Ohio Railroad Company (hereinafter "B & O") and the Western Maryland Railway Company (hereinafter "Western Maryland") have brought this action to enjoin the members of the Brotherhood of Railway, Airline and Steamship Clerks (hereinafter "BRAC") from picketing at various rail facilities in the District of Maryland. On September 26, 1978, the Court issued an Order which preliminarily enjoined the employees of the plaintiff railroads from picketing at the facilities of their employers and which also enjoined preliminarily the employees of the Norfolk and Western Railway Company (hereinafter "N & W") from picketing at the facilities of the plaintiff railroads other than where N & W cars are physically interchanged or serviced.

In granting the preliminary injunction, the Court indicated that it would issue a memorandum opinion stating the reasons in support of the Order. However, several days after the injunction had been issued, all striking railroad workers were ordered back to work and the disputing parties back to the bargaining table. *See Alton & Southern Railway Co. v. BRAC*, No. 78–1829 (D.D.C. September 29, 1978.) Because the work stoppage challenged in this case thereafter ceased, and because there appeared a possibility that this matter might be resolved without further resort to this Court, the memorandum opinion was withheld. All parties have now expressed a clear intention of prosecuting the appeal. The reasons for the issuance of the injunction are set forth herein pursuant to Rule 65(a), Federal Rules of Civil Procedure, and 29 U.S.C. § 107.

*I.*

This case has arisen in the context of a bitter strike, which severely disrupted rail traffic not only in this District, but throughout the country. The work stoppages generated by BRAC picketing at various rail facilities threatened dislocation of a national economy dependant upon the unimpeded movement of goods, raw materials, and commuting personnel. These circumstances were responsible for the filing in federal courts of more than 20 actions, each brought by railroads seeking to enjoin picketing by BRAC at facilities providing interchange service for N & W trains.

The acute crisis of September was an outgrowth of BRAC's strike against the N & W over a contract provision affecting job security.[1] On July 10, 1978, the day that the strike commenced, N & W brought suit in the United States District Court for the Northern District of Illinois seeking injunctive relief against the union. The motions for a temporary restraining order and preliminary injunction were denied, and the railroad's contention that the strike was enjoinable as a violation of the Railway Labor Act, 45 U.S.C. § 151 *et seq.*, was rejected. *Norfolk and Western Railway Company v. BRAC*, No. 78–C–2577 (N.D.Ill. July 20, 1978). N & W promptly appealed the decision to the United States Court of Appeals for the Seventh Circuit, which affirmed the lower court and denied the railroad's motion for an injunction pending appeal. *Norfolk & Western Railway Company v. BRAC*, No. 78–C–2577 (7th Cir. July 28, 1978).

As the strike progressed, BRAC expanded its picketing to include actions against 73 railroads participating in the Service Interruption Policies, a strike insurance plan which helped sustain N & W during the BRAC strike. Several of the picketed railroads then brought suit in the United States District Court for the District of Columbia to enjoin the BRAC picketing, resulting in a denial of railroads' motion for a preliminary injunction, dissolution of an outstanding TRO, and transfer of the case to the Northern District of Illinois. *Alton & Southern Railway Company v. BRAC*, Civ. Act. 78–1607 (D.D.C. September 12, 1978). The United States Court of Appeals for the District of Columbia Circuit affirmed the District Court, *Alton & Southern Railway Company v. BRAC*, No. 78–1607 (D.C.Cir. September 15, 1978); however, the Court temporarily stayed transfer of the case and issued its own injunction against continued picketing pending application by the railroads to the Supreme Court for a further stay of the proceedings during application for a writ of certiorari. On September 22, 1978, the Chief Justice issued a temporary stay of the proceedings until the full Court could convene, and on September 26, 1978, the Court withdrew the earlier stay, thereby according full force to the lower court's order of September 12, 1978.

---

1. At issue in the BRAC–N & W dispute are changes in the so-called "scope rule." The change proposed by the defendant union would require all work traditionally performed by employees within the clerical or telegrapher craft and class to continue to be performed by employees represented by BRAC, in the event a position is abolished or machines are employed to handle such work.

The picketing at issue in the present case commenced on or about September 19, 1978. When BRAC affiliated pickets appeared at Western Maryland's Hagerstown yard, the plaintiff railroad immediately applied to this Court for a Temporary Restraining Order. The Court granted plaintiff's request in part, temporarily restraining picketing at the Hagerstown site only by the BRAC affiliated employees of the plaintiff railroads. Accordingly, BRAC members employed by the N & W were permitted to continue picketing at the Hagerstown facility.

Two days later, Western Maryland joined with the Baltimore & Ohio Railroad in seeking further relief against continued picketing at Hagerstown and the commencement of picketing at jointly operated facilities at Cumberland. On September 21, 1978, the Court temporarily restrained the employees of the plaintiff railroads from picketing at the facilities of their employers, and it restrained N & W employees from picketing at Hagerstown and Cumberland within 150 feet of entrance points. Further, the Court declined to restrain the employees of the plaintiff railroads from honoring BRAC picket lines. A hearing on plaintiffs' motion for a preliminary injunction was then scheduled for September 25, 1978.

Throughout the proceedings in the instant action, the defendant union was subject to the order of various courts [2] preventing its members from lawfully picketing numerous railroads, including the plaintiffs, for their assistance of N & W during the BRAC strike as signatories to the Service Interruption plan. The only question which was litigated by the parties in connection with this Court's Order of September 26, 1978, was whether BRAC could be enjoined from picketing the plaintiff railroads for any other assistance they afforded N & W during the union's strike against that railroad.

The following facts are agreed to by the parties or are so conclusively proved as to allow no other interpretation. On September 19, 1978, BRAC members employed by the Western Maryland and others employed by the N & W began picketing at the Western Maryland yard at Hagerstown, Maryland. On September 21, 1978, picketing commenced at rail facilities at Cumberland, Maryland and at Connellsville, Pennsylvania by BRAC members employed by the N & W. The following day, picketing was expanded to include the rail facilities at Brunswick, Maryland.

The Hagerstown facilities of Western Maryland include a classification yard, where a large volume of freight traffic is handled, including cars carrying freight for the N & W, whose cars are interchanged with trains moving on the Western Maryland system. Reportedly, N & W freight accounts for less than 10% of the traffic at the Hagerstown yard.

The classification yard at Cumberland is jointly owned by the Western Maryland and the B & O. The N & W has no rail facility at Cumberland, and no freight traffic of any kind is interchanged between the plaintiff railroads and the N & W there. The defendant union supports its picketing at this facility on the ground that Cumberland is a switching terminal where clerical employees prepare records which enable N & W cars to be interchanged with trains of the plaintiff railroads at Shenandoah, West Virginia. However, the record shows that the clerical duties conducted at the Cumberland facility have nothing to do with the interchange of cars between the N & W and either of the plaintiff railroads.[3]

---

**2.** On September 15, 1978, the D.C. Circuit temporarily enjoined further picketing on the strike insurance issue until September 23, 1978. On September 23, 1978, the Chief Justice continued the injunction until September 26, 1978, when it was withdrawn, thereby freeing BRAC to continue its action against the railroads assisting the N & W by their participation in the strike insurance plan. The signatories to this strike insurance agreement include the plaintiff railroads. See Alton & Southern Railway Company v. BRAC, Civ. Act. 78–1607 (D.D.C. September 12, 1978).

**3.** On the basis of the sworn statement of Melvin O. Benson, the General Superintendent-Transportation for the Chessie System, who has responsibility for all record keeping pertaining to transportation matters for B & O and

The B & O facility at Brunswick consists of a terminal and yard. The N & W has no rail facilities at Brunswick and the B & O interchanges no cars with the N & W there. The defendant union also contends that records are kept at Brunswick which facilitate interchange at other locations; however, the record establishes no greater nexus between activities at Brunswick and the interchange of N & W cars than was established with respect to Cumberland.

The picketing by BRAC at facilities at Connellsville, Pennsylvania, having ceased after one day on September 22, 1978, is not an issue in the present case.

## II.

This case presents a situation in which there are competing though not unreconcilable policies of federal law. On the one hand, there is the Norris-LaGuardia Act, 29 U.S.C. §§ 101–115, which substantially limits federal court jurisdiction to issue injunctions against labor. On the other hand, there is the Railway Labor Act, 45 U.S.C. §§ 151 *et seq.*, which provides a mechanism for the peaceful resolution of labor disputes to forestall paralyzing strikes. In view of the tension between these two provisions, the case presents the following issues:

A. Whether, notwithstanding the applicability of the Norris-LaGuardia Act, the court may enjoin defendant union because of its failure to comply with the Railway Labor Act;

B. Whether, notwithstanding the applicability of the Norris-LaGuardia Act, the court may enjoin the defendant union because its demands on plaintiff railroads would require the plaintiffs to violate the Interstate Commerce Act; and

C. Whether the court's equity jurisdiction has been withdrawn because of the applicability of the Norris-LaGuardia Act.

### A. The Impact of the Railway Labor Act

Plaintiffs argue, and indeed, it is generally accepted, that strikes in violation of the Railway Labor Act may be enjoined, notwithstanding the Norris-LaGuardia Act. *Chicago & N. W. R. Co. v. United Transportation Union*, 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971); *Trainmen v. Chicago, R. & I. R. Co.*, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957). The particular issue in this case is whether there has been compliance with the Railway Labor Act.

The contention that BRAC's strike against the N & W is not a lawful strike under the terms of the Railway Labor Act has already been rejected. *See Norfolk and Western Railway Company v. BRAC*, No. 78–C–2577 (N.D.Ill. July 20, 1978), *aff'd*, No. 78–C–2577 (7th Cir. July 28, 1978). The plaintiff railroads however argue that the Railway Labor Act requires BRAC to submit for possible settlement any dispute which develops, including those disputes which develop subsequent to a lawful resort to self-help under the Act. In the context of this case, plaintiffs argue that the question of their interchanging N & W cars, which prompted the BRAC picketing and resulted in work stoppages at various of plaintiffs' facilities, was the kind of dispute that required some effort to settle before self-help could be lawfully employed. It should be noted that in a similar action before the United States District Court for Western District of New York, the Court found little merit in this argument and dismissed it without extended discussion. *Consolidated Rail Corporation v. BRAC*, Civ.–78–589 (W.D.N.Y. September 23, 1978) at 8.

The first objection to the plaintiffs' proposed construction of the Railway Labor Act is that it runs contrary to the policy behind the Act. Plaintiffs correctly state, with undue emphasis, that the purpose of

---

Western Maryland in the State of Maryland, it is clear that the records at Cumberland and Brunswick are maintained to identify all cars travelling on the lines of the plaintiff railroads for the purpose of assessing per diem charges.

This clerical task in no way is responsible for N & W cars being interchanged and serviced by the plaintiff railroads, since it merely reflects, *after the fact*, that an interchange has occurred at some point in the Chessie System.

the Act is "[t]o avoid any interruption to commerce or to the operation of any carrier engaged therein." 45 U.S.C. § 151a(1). However, the Act was not enacted to outlaw strikes against interstate carriers. *See generally Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 377–80, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969). Rather, the Act was designed to provide "a detailed framework to facilitate the voluntary settlement of major disputes." *Id.* at 378, 89 S.Ct. at 1115. But once the procedures for voluntary resolution of labor disputes have been unsuccessfully exhausted, both sides are free to "resort to economic warfare." *Id.* at 379, 89 S.Ct. 1109. Indeed, Congress specifically rejected proposals for compulsory arbitration and antistrike laws which would have precluded self-help. *Id.*

██ The defendant union has exhausted all settlement procedures under the Railway Labor Act, and is presently engaged in a self-help effort against the N & W. Its "dispute" with the plaintiff carriers is no more than incident to its underlying dispute with the N & W. By their reading of the Act, plaintiffs would effectively reduce the weapons available to labor once the "resort to economic warfare" has been authorized by initial compliance with the settlement procedures of the Act. These weapons include the strike and secondary picketing aimed at shutting down the operation of a target employer by appealing to all affiliated workers to cease labor on his behalf. It is clear that once settlement procedures have been exhausted, the Act does not authorize the Court, or any other arm of government, to intervene to alter the balance of economic forces in favor of one side or the other. *See, e. g., Railway Clerks v. Florida E. C. R. Co.*, 384 U.S. 238, 86 S.Ct. 1420, 16 L.Ed.2d 501 (1966). Were this Court to read the Act as requiring the defendant union to submit for settlement each dispute which subsequently develops as a consequence of a lawful resort to self-help, the Court would thereby regulate the "economic warfare" which Congress expressly intended not to regulate, but only to forestall. In the present case, circumstances have proceeded beyond the scope of settlement procedures mandated by the Railway Labor Act.

Second, the defendant union's "dispute" with the plaintiff carriers fails to qualify as a dispute within the meaning of the Railway Labor Act itself. *See Consolidated Rail Corporation v. BRAC, supra*, at 8; *Northwest Airlines, Inc. v. Air Line Pilots Ass'n, Int.*, 325 F.Supp. 994 (D.Minn.1970); *also Brotherhood of R. Trainmen v. Atlantic Coast Line R. Co.*, 362 F.2d 649, 655 (5th Cir.), *aff'd by an equally divided court*, 385 U.S. 20, 87 S.Ct. 226, 17 L.Ed.2d 20 (1966); *Chicago & Illinois Midland Ry. Co. v. Brotherhood of Ry. Trainmen*, 315 F.2d 771, 777–78 (7th Cir.) (Swygert, J., dissenting), *vacated and dismissed as moot*, 375 U.S. 18, 84 S.Ct. 61, 11 L.Ed.2d 39 (1963); *but see Chicago and Illinois Midland Ry. Co. v. Brotherhood of Ry. Trainmen, supra*, (majority opinion). The District Court for the Western District of New York, in a related matter, dismissed the same argument advanced by the plaintiffs in this case, reasoning:

"The RLA is not applicable to this situation; N & W BRAC is not seeking to negotiate matters dealing with the terms and conditions of its members' employment with ConRail. The term labor dispute as used in the Norris-LaGuardia Act has a broader meaning than the same term in the RLA." *Consolidated Rail Corporation v. BRAC, supra*, at 8.

Disagreeing with the majority in *Chicago Midland*, Judge Swygert, in a well-reasoned dissent, examined the inapplicability of the Railway Labor Act to "disputes" arising from a lawful resort to self-help under the Act. *Chicago & Illinois Midland Ry. Co. v. Brotherhood of Rail. Tr.*, 315 F.2d at 777.

"Section 2 of the Railway Labor Act, 45 U.S.C. § 151a, enumerates the disputes to which the Act applies as 'all disputes concerning rates of pay, rules, or working conditions' and 'all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions.

"I do not see how the employees' refusal to go through the picket line and hence

not report for work at the yard facilities can be said to be a dispute between the railroad and its employees relating to 'their own contract or their own working conditions.' *Northwest Airlines, Inc. v. Transport Workers Union*, 190 F.Supp. 495, 498 (D.C.W.D.Wash.1961).

"The acts of the employees and their Brotherhoods in the instant case were not motivated by any dispute they have with the railroad growing out of 'grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions.' Accordingly, there could not have existed a 'minor' dispute requiring the parties under the Railway Labor Act to negotiate and confer, unless it can be said that a railway labor organization must 'negotiate' before respecting another union's picket line.

\*       \*       \*       \*       \*       \*

"In sum, it seems to me on this point that the refusal of the employees to cross the picket line under the circumstances was a non-negotiable dispute, if it was a dispute at all, and in any event it was not a dispute cognizable under the Railway Labor Act."

■ Persuaded by this reasoning, the Court rejects the argument that the picketing by the defendant union may be enjoined under the authority of the Railway Labor Act because the union has failed to negotiate with the plaintiff railroads concerning their interchanging of N & W cars. Accordingly, the Court is satisfied that the Railway Labor Act is inapplicable to the picketing in question.

### B. The Effect of the Interstate Commerce Act

Section 1(4) of the Interstate Commerce Act requires common carriers "to establish reasonable through routes with other such carriers." 49 U.S.C. § 1(4). And Section 1(11) requires every carrier "to furnish safe and adequate car service" defined by Section 1(10) to include the interchange and return of locomotives and cars. 49 U.S.C. §§ 1(10), 1(11). Plaintiffs argue they are statutorily required to provide the services

to N & W cars which the defendant union is trying to preclude.

■ It is conceded that labor activity in violation of any other specific *labor* legislation is enjoinable despite the restrictions on the Court's equity jurisdiction provided by Norris-LaGuardia. *Trainmen v. Chicago, R. & I. R. Co., supra.*

However, union activity in violation of *non-labor* legislation is still protected by Norris-LaGuardia. *Order of Railroad Telegraphers v. Chicago & Northwestern Ry. Co.*, 362 U.S. 330, 339, n.15, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960); *Brotherhood of R. Train. v. Atlantic Coast Line R. Co.*, 362 F.2d at 655.

■ Plaintiffs have withdrawn an argument expressed earlier in the proceedings that the defendant's picketing was enjoinable solely because it would have required the plaintiff railroads to violate the command of the Interstate Commerce Act. Instead, the plaintiff railroads argue that because of the mandatory provisions of the Interstate Commerce Act, the interchange of N & W cars is a non-bargainable issue, and that BRAC's picketing over that issue is a violation of the Railway Labor Act. *See Bangor and Aroostock R. Co. v. Brotherhood of Loc. F. & E.*, 253 F.Supp. 682 (D.D.C.1966), *modified sub nom. Brotherhood of Railroad Trainmen v. Akron & B. B. R. Co.*, 128 U.S.App.D.C. 59, 385 F.2d 581 (1967), *cert. denied*, 390 U.S. 923, 88 S.Ct. 851, 19 L.Ed.2d 983 (1968). The thrust of plaintiffs' argument is that the Railway Labor Act does not authorize a resort to self-help when settlement procedures fail over a non-bargainable issue. However, this argument is of no effect since the Court has determined that the Railway Labor Act does not apply to the picketing in dispute and, therefore, provides no basis for lawfully enjoining the picketing by BRAC.

While one may question the legality under the Railway Labor Act and Norris-LaGuardia of the secondary strike tactics employed by the defendant union, this question is separate from whether the policies behind the Railway Labor Act are fur-

thered by submitting secondary strike disputes to the settlement procedures of the Act. It is academic that further settlement efforts, once a strike has begun, will not work to forestall a pending strike, but operate to break an already existing one. Given the legislative history of the Act, where Congress expressly rejected strike breaking proposals, such a reading of the provision which transforms it into a strike breaking device goes beyond the intent of Congress.

### C. The Injunction of Secondary Strike Tactics Under Norris-LaGuardia

Under the Norris-LaGuardia Act, 29 U.S.C. § 101 *et seq.*, no federal court has jurisdiction to issue an injunction or restraining order in a case "involving or growing out of a labor dispute." Such a case is defined by 29 U.S.C. § 113(a), as involving "persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein;· or who are employees of the same employer; or who are members of the same or an affiliated organization of employers or employees. . . ." Further, the section provides that it is applicable "when the case involves any conflicting or competing interest in a 'labor dispute' . . . of 'persons participating or interested' therein . . . ." § 113(a)(3).

Under 29 U.S.C. § 113, participation or interest in a labor dispute is defined as follows:

"(b) A person or association shall be held to be a person participating or interested in a labor dispute if relief is sought against him or it, and if he or it is engaged in the same industry, trade, craft, or occupation in which such dispute occurs, or has a direct or indirect interest therein, or is a member, officer, or agent of any association composed in whole or in part of employers or employees engaged in such industry, trade, craft, or occupation."

In addition, the Act defines "labor dispute" in the manner below:

"(c) The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in ·negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee."

The above quoted sections chart the area of labor activities which the Act withdrew from the court's equity jurisdiction. First, there must exist a labor dispute underlying the union activity in question, and second, the activity must "grow out" of that dispute and involve persons with an "interest" in the dispute. In the present case, there is no question that there is a genuine labor dispute underlying the defendant union's picketing of the plaintiff railroads. The District Court for the Northern District of Illinois held that BRAC's strike against the N & W was lawful and in accordance with the Railway Labor Act. *See Norfolk and Western Railway Company v. BRAC, supra.*

The question presented here is whether picketing by each of two sets of employees at three different locations can be found to grow out of a labor dispute so as to trigger the protections of Norris-LaGuardia. In other words, has each set of employees, the BRAC members employed by the N & W and those employed by the plaintiff railroads, an "interest" in BRAC's labor dispute with the N & W, and does the picketing at each of the locations in question "grow out of" that dispute?

■ There can be no question that the BRAC–N & W employees would have sufficient interest in the labor dispute with the N & W, which underlies the picketing of the plaintiff railroads, to enjoy immunity from injunction under Norris-LaGuardia if it is found that the picketing in fact "grows out of" that dispute. The N & W employees will be immediately affected by the success of the BRAC strike and the outcome of negotiations with the N & W concerning work conditions. The interest of the employees of the plaintiff railroads in the work conditions of N & W employees is more nebulous.

On facts similar to the present case, the Fifth Circuit reversed a lower court's injunction against the employees of the Broward County Port Authority who had refused to cross picket lines formed by striking employees of the Florida East Coast Railway (hereinafter "FEC"), protesting the interchanging of FEC cars at the terminal. The Court of Appeals determined that Port Authority employees had an "interest" in the dispute between the FEC and its employees. *Brotherhood of Loc. Fire. & Eng. v. Florida East Coast Ry. Co.*, 346 F.2d 673, 675 (5th Cir. 1965).

> We also think it is clear that this case involves or grows out of the labor dispute at FEC and that the Port Authority employees are persons interested in that dispute. The Port Authority employees refused to service the FEC interchange track solely because of the strike and picketing at FEC. This litigation would never have arisen were it not for the labor dispute at FEC. The Authority's employees are interested in the dispute in that they are members of the same trade or industry as the striking FEC workers, see 29 U.S.C.A. § 113(b), and desire to make common cause with them by honoring their lawful picket line.

Thus, the "desire to make common cause" with the striking employees of another employer was sufficient to make applicable the protection of Norris-LaGuardia to the actions of sympathetic union members not immediately involved in a labor dispute.

At the other extreme, the Sixth Circuit has been reluctant to hold so attenuated a relationship as described in *Florida East Coast* as meeting the requirements of Norris-LaGuardia. *See Lakefront D. & R. T. Co. v. International Longshoremen's Ass'n*, 333 F.2d 549 (6th Cir. 1964). In *Lakefront*, the Court of Appeals declined to suspend a preliminary injunction issued by a lower court which enjoined the defendant union from honoring a picket line of striking Canadian seamen protesting their lockout by the employer-shipping line and the hiring of non-union personnel.

An intermediate position may be found in the Fifth Circuit's decision in *Brotherhood of R. Trainmen v. Atlantic Coast Line Ry. Co., supra*, which was decided by the Fifth Circuit roughly a year after *Florida East Coast*. In *Atlantic Coast Line*, the railroad sought to enjoin picketing at a terminal facility which it jointly owned with two other railroads, one of which was the employer against whom the picketing was directed. The continued operation of the terminal was threatened by a work stoppage in deference to the picketing. In assessing the "interest" of parties in a labor dispute under Norris-LaGuardia, the Fifth Circuit applied an "economic self interest" analysis. 362 F.2d at 654, n.6.

> Implicit support for this . . . [analysis] also may be found in *New Negro Alliance v. Sanitary Grocery Co.*, 303 U.S. 552, 562–563 [58 S.Ct. 703, 82 L.Ed. 1012] (1938). (Norris-LaGuardia passed to overcome qualifying effects of *Duplex* decision). And *cf. Carpenters & Joiners Union v. Ritter's Cafe*, 315 U.S. 722, 724–728, 62 S.Ct. 807, 86 L.Ed. 1143 (1942); *United States v. Hutcheson*, 312 U.S. 219, 231–236, 61 S.Ct. 463, 85 L.Ed. 788 (1941). These latter two cases support the proposition that the proper framework for a Norris-LaGuardia "labor dispute" falls substantially short of an all-out class war, unrelated to fairly direct economic interests of the disputants.

In the words of Professor Charles O. Gregory:

> "It is as if Congress had said in [the Norris-LaGuardia] act:
>
> 'This you may do, using the techniques we have suggested, as long as you can show that your union economic program, conceived as you and not anyone else sees it, is affected by the existing employment conditions in the units of the industry with which you are concerned. We have instructed the judges to withhold the use of the injunction against your self-help coercive activities directed along these lines. From now on it is up to you union people to promote your own economic interests, as you see them, within the area of

conflict we have defined.' Gregory, Labor and the Law, 192 (2d Rev.ed. 1961).

In essence, this test requires participants in a work action to justify their involvement in a labor dispute in terms of the economic benefit each expects to secure by the favorable outcome of the dispute. Applying this principle to the facts of *Atlantic Coast Line* the Court observed:

"Turning next to a further examination of the economic interests of the responding employees of the secondary employer-appellees, it should be emphasized that their interests go beyond the 'common industrial interest' discussed above. It can be stated unequivocally that Seaboard and FEC are in direct competition for passenger and freight traffic south of West Palm Beach. As far as the ACL and FEC are concerned, the competition, although less direct, cannot be said to be non-existent, especially between Jacksonville and a line drawn from Orlando to the Atlantic Ocean. The significance of this competition lies in the fact that the FEC, by changing work rules and lowering wages, presents a direct threat to the job security of the employees of SAL and ACL. In other words, by operating under such lower than union standards of employment, the FEC enjoys a competitive advantage, which may enable it to increase its share of traffic, vis a vis, ACL and SAL, and, consequently, the latter two railroads could be forced to either (a) lower their standards or (b) lay off a sufficient number of employees to compensate for their reduced traffic share. Accordingly, it is improper to regard the responses of ACL and SAL employees as merely sympathetic."

*Brotherhood of R. Trainmen v. Atlantic Coastline R. Co.*, 362 F.2d at 655. (Footnotes omitted).

The defendant union seeks to fit the facts of the present case into the *Atlantic Coast Line* mold, arguing that the employees of the plaintiff railroads have an economic interest in the BRAC–N & W dispute and that the outcome of the dispute will directly affect their ability to maintain their existing "scope rule"—which reportedly is superior to the rule involved in the BRAC–N & W dispute [4]—and achieve improvements in the future.

■ Recognizing that the facts of an appropriate case may show the employees of one employer economically interested in the outcome of a labor dispute involving another employer and its workers, the Court, however, is not persuaded that such is this case. While it has been admitted that, like the railroads in *Atlantic Coast Line*, the N & W competes with each of the plaintiff railroads for freight traffic on many of the same lines, it does not necessarily follow that resolution of the BRAC–N & W dispute in favor of the railroad would give the N & W such a competitive advantage over either the Western Maryland or the B & O as to endanger existing agreements between each of the plaintiff railroads and its employees. First, the uncontested evidence indicates that the expense of employing a clerical staff "at most constitutes an insignificant aspect" of the cost of handling freight.[5] Second, contrary to the suggestion of the defendant union, admitted differences in the "scope rule" covering N & W employees from the more generous provision covering their counterparts with the Western Maryland and the B & O have not in the past effected an appreciable diversion of traffic from either of the plaintiff

4. In an affidavit submitted by the defendant union, E. J. Reynolds, the General Chairman of BRAC System Board No. 6, acknowledged that the provisions of the "scope rule" covering the BRAC represented employees of the plaintiff railroads is "closer to reaching the goal" of the changes proposed by BRAC in its negotiations with the N & W than the provision currently covering N & W employees.

5. According to J. C. Spurrier, Director—Pricing of the Chessie System, which includes the plaintiff railroads, "clerical expense is either assigned no weight or at most constitutes an insignificant aspect of variable cost," which is a component of the total cost of handling freight. *See* Affidavit of J. C. Spurrier, September 25, 1978.

railroads to the N & W.[6] Consequently, there is no reason to presume that the outcome of the BRAC–N & W dispute will have an adverse effect on the labor agreement which each of the plaintiff railroads has with its clerical workers.

The matters in dispute between BRAC and the N & W have not to date manifested an impact on the business of the plaintiff railroads. Nor has it been shown that the inferior N & W "scope rule" has ever figured substantially in labor negotiations between BRAC and each of the plaintiff railroads, since the union has been able to secure and maintain generous "scope" agreements with the B & O and the Western Maryland, notwithstanding its apparent failure to come to satisfactory terms with the N & W. The record therefore fails to establish an economic interest of the employees of the plaintiff railroads in the BRAC–N & W labor dispute. Because their interest in the BRAC–N & W dispute does not "go beyond 'common industrial interest' . . . .", the Court is not precluded by Norris-LaGuardia from enjoining the employees of the plaintiff railroads from joining their brother union members on the picket line in BRAC's dispute with the N & W. *See Brotherhood of R. Trainmen v. Atlantic Coast Line Ry. Co.*, 362 F.2d at 655.

■ Given the obvious interest of picketing N & W employees in the outcome of the BRAC–N & W labor dispute, Norris-LaGuardia would bar an injunction of their picketing as long as the picketing can be found to grow out of that labor dispute. The involvement of workers in the labor dispute underlying their participation in some union activity has already been analyzed from the standpoint of economic self interest. *See, e. g., Brotherhood of R. Trainmen v. Atlantic Coast Line Ry. Co.*, *supra*. In determining whether an activity grows out of a labor dispute for the purpose of Norris-LaGuradia, a similar approach is appropriate. Where a particular labor ac-

tivity has no economic impact on an employer engaged in a labor dispute, the activity can have no effect on the outcome of the dispute, and for that reason, it is not protected under Norris-LaGuardia as growing out of that dispute.

■ This conclusion follows from the analysis of the legislative purpose of Norris-LaGuardia pursued by the Fifth Circuit in *Atlantic Coast Line*. In determining the intended scope of Norris-LaGuardia protection in terms of economic self-interest, the Court concluded "that the proper framework for a Norris-LaGuardia 'labor dispute' falls substantially short of an all-out class war, unrelated to fairly direct economic interests of the disputants." 362 F.2d at 654, n.6. Thus, the range of activities protected by Norris-LaGuardia as growing out of a labor dispute is defined by the concrete economic interests of the parties.

■ For the picketing at the various locations involved in the present case to be immune from injunction under Norris-LaGuardia, it must appear on the record that the picketing in some way promotes "fairly direct economic interests" of the defendant union in its dispute with the N & W. In picketing the N & W and other railroads servicing N & W freight traffic, the defendant union seeks to coerce the railroad into accepting its demands by effecting a shutdown of the employer's operation. This has been the way labor has traditionally gone about promoting its interests. However, since the activities of the plaintiff railroads in Cumberland and Brunswick do not involve the servicing of N & W freight traffic, the Court must conclude that the picketing at these facilities furthers no economic interest of BRAC in the underlying labor dispute. Accordingly, the Court finds that BRAC's picketing at the Cumberland and Brunswick facilities of the plaintiff railroads does not "grow out of a labor dispute" and is therefore enjoinable consistent with Norris-LaGuardia.

---

**6.** Spurrier also indicated that since June, 1973 —the approximate date of the plaintiff railroads' current agreement with BRAC which includes the more generous scope provision, *see* Affidavit of Brenton C. Massie, September 22, 1978—there has been no diversion of B & O or Western Maryland freight traffic to the N & W, and each of the plaintiff railroads has been able to compete with the N & W under the same freight rates.

A slightly different question is posed with respect to the picketing at the Hagerstown yard where interchange services are performed by the Western Maryland for the N & W. According to the evidence presented, the interchange of N & W cars at this facility accounts for less than 10% of the traffic serviced there. Because of the comparatively small assistance provided the N & W at the Hagerstown yard, and given the mandatory nature of these services under the Interstate Commerce Act, the Western Maryland argues that picketing at this facility also is enjoinable, since the record has not shown the railroad to be "substantially aligned" with the N & W in its dispute with the defendant union. In support of this "substantial alignment" theory, plaintiffs rely upon *Consolidated Rail Corporation v. BRAC, supra*, and *Atlantic Coast Line*.

The *Consolidated Rail* litigation arose in circumstances similar to the present case. As a part of its action against the N & W, BRAC began picketing at facilities, some of which were solely owned by Conrail. In support of its injunction of picketing at the facility solely owned by Conrail, the Court construed the "economic self interest" test of *Atlantic Coast Line* as permitting injunctions under Norris-LaGuardia "where the union attempts to picket the solely-owned facilities of the secondary employer . . . [and there is no] substantial alignment between the two employers." *Consolidated Rail Corporation v. BRAC, supra*, at 11. According to *Consolidated Rail*, unless a secondary employer has afforded the struck primary employer greater assistance after a strike than before it, picketing against this secondary employer may be enjoined consistent with Norris-LaGuardia.

This Court declines to read narrowly the "substantial alignment" language of the Fifth Circuit in *Brotherhood of R. Trainmen v. Atlantic Coast Line*, 362 F.2d at 654–55. Nowhere in the opinion was the Court of Appeals interested in determining whether the secondary employer had increased its assistance of the primary employer after commencement of the strike. Nor did the Court consider as critical the volume of traffic serviced at the facility on behalf of the primary employer. Rather, it focused on the *nature* of the services provided the primary employer at the facility, not their extent. Specifically, the Court concluded that "the picketing union . . . had an obvious interest in putting a stop to the Terminal Company's [the secondary employer] performing services related to the normal, day to day operation" of the target employer. 362 F.2d at 654. In finding the secondary employer "aligned . . . in some substantial manner" with the primary employer, the Court intended nothing more than that the secondary employer had "provid[ed] certain essential services and facilities to the primary employer." 362 F.2d at 655. Thus, the so-called "substantial alignment" requirement is little more than a refinement of the "economic self interest" analysis which has been applied to BRAC picketing at Cumberland and Brunswick.

The question presented regarding injunction of the picketing at Hagerstown turns on whether the Western Maryland provides the N & W "services related to the day-to-day operation" of the railroad. Given the fact that the interchange services which the defendant union sought to prevent by picketing are mandated by Congress in the Interstate Commerce Act, and as the N & W would likely be cut off from many of its customers without interchange, it is academic that the services provided by the Western Maryland at Hagerstown are, in nature, essential to the daily operation of the N & W. Accordingly, the Court finds that, as the defendant union has an economic interest in picketing at the Hagerstown yard, its picketing is beyond the reach of this Court's injunctive authority.

### III.

Having found that N & W employees may picket at the Hagerstown facility, while finding that the employees of the plaintiff railroads have no interest in the BRAC–N & W dispute which shields them from the injunctive authority of the Court, it is necessary to determine whether these latter employees can be enjoined from hon-

oring the picket lines of the N & W employees affiliated with BRAC.

From the time the decision of the Supreme Court in *Buffalo Forge Co. v. Steelworkers*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), it has been presumed that federal courts lack jurisdiction under Norris-LaGuardia to enjoin workers from honoring lawfully established picket lines, notwithstanding their lack of interest in the underlying labor dispute. In *Buffalo Forge*, the Court affirmed the denial of a preliminary injunction, holding that a collective bargaining agreement's no strike clause over disputes concerning work conditions did not qualify under the so-called *Boys Market*[7] exception to Norris-LaGuardia to permit injunction of a work stoppage which resulted solely out of respect for established picket lines. Implicitly, the Court held that the workers honoring a lawfully established picket line are shielded from injunction notwithstanding the fact that they had no dispute with the picketed employer. On the basis of this decision, at least one court has held workers honoring picket lines immune from injunction under Norris-LaGuardia. *See U. S. Steel Corp. v. United Mine Workers, Etc.*, 418 F.Supp. 172 (W.D.Pa.1976).

In the present case, the employees of the plaintiff railroads cannot be enjoined without restricting the ability of N & W employees to maintain an effective picket line at Hagerstown. Traditionally, unions have picketed with the expectation that other union members would honor the lines established by not crossing them. Indeed, without the expectation that picket lines would be honored, picketing is of little practical effect. An injunction which prevents the employees of the plaintiff railroads from honoring the picket lines of N & W

employees in effect reaches these latter employees, who, under Norris-LaGuardia, are beyond the reach of the Court's equity jurisdiction. Accordingly, the Court lacks jurisdiction to restrict so the defendant union in its lawful resort to self-help against the N & W at the Hagerstown facility.

## IV.

Because the record presented has shown that picketing has proceeded at the Hagerstown facility without the occurrence of violence, the Court has not continued the provision contained in its Temporary Restraining Order of September 21, 1978, which restricted lawful picketing by the defendant union to areas beyond 150 feet of points of entrance at rail facilities.

Accordingly, for the foregoing reasons, the Court issued its Order of September 26, 1978, which provided:

1. That all individuals who are employee members of the Brotherhood of Railway, Airline and Steamship Clerks, Freighthandlers, Expressmen and Station Employees are hereby preliminarily enjoined from picketing the premises of the plaintiff railroads;

2. That all individuals who are members of the Brotherhood of Railway, Airline and Steamship Clerks, Freighthandlers, Expressmen and Station Employees, and who are employees of the Norfolk and Western Railroad are hereby preliminarily enjoined from picketing all locations within the District of Maryland, except at the Hagerstown Yard or at any other location where plaintiff railroads are involved in the physical interchange of cars with the Norfolk and Western Railroad; and

---

7. In *Boys Markets v. Retail Clerks Union*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), the Supreme Court created a narrow exception to Norris-LaGuardia's general prohibition of federal court labor injunctions, where a collective bargaining contract bound the parties to submit disputes to mandatory grievance and arbitration procedures. Where a strike resulted from a labor dispute of the kind subject to the grievance and arbitration provisions of the collective bargaining agreement and the strike was in violation of the agreement, the strike may be enjoined. As the Supreme Court considered the validity of the injunction in *Buffalo Forge* from only the standpoint of the narrow *Boys Markets* exception to Norris-LaGuardia, it presumed that Norris-LaGuardia other wise precluded injunction of the work stoppage in deference to the established picket lines of another union local.

3. That plaintiff railroads will post bond in the amount of Twenty-Five Thousand ($25,000.00) Dollars.

SO ORDERED.